# MARYLAND *v.* CRAIG

No. 89–478.   Argued April 18, 1990—Decided June 27, 1990

838

O'Connor, J., delivered the opinion of the Court, in which Rehnquist, C. J., and White, Blackmun, and Kennedy, JJ., joined. Scalia, J., filed a dissenting opinion, in which Brennan, Marshall, and Stevens, JJ., joined, *post*, p. 860.

*J. Joseph Curran, Jr.*, Attorney General of Maryland, argued the cause for petitioner. With him on the briefs were *Gary E. Bair* and *Ann N. Bosse*, Assistant Attorneys General, and *William R. Hymes*.

*William H. Murphy, Jr.*, argued the cause for respondent. With him on the brief were *Maria Cristina Gutierrez, Gary S. Bernstein, Byron L. Warnken,* and *Clarke F. Ahlers.* *

---

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Robert A. Butterworth*, Attorney General of Florida, and *Richard E. Doran* and *Bradley R. Bischoff*, Assistant Attorneys General, *Don Siegelman*, Attorney General of Alabama, *Doug Baily*, Attorney General of Alaska, *Robert K. Corbin*, Attorney General of Arizona, *John Steven Clark*, Attorney General of Arkansas, *Duane Woodard*, Attorney General of Colorado, *John J. Kelly*, Chief State's Attorney of Connecticut, *Charles M. Oberly III*, Attorney General of Delaware, *Warren Price III*, Attorney General of Hawaii, *Jim Jones*, Attorney General of Idaho, *Neil F. Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Thomas J. Miller*, Attorney General of Iowa, *Robert T. Stephan*, Attorney General of Kansas, *Frederic J. Cowan*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *James M. Shannon*, Attorney General of Massachusetts, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Mike Moore*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Marc Racicot*, Attorney General of Montana, *Robert M. Spire*, Attorney General of Nebraska, *Brian McKay*, Attorney General of Nevada, *Robert J. Del Tufo*, Attorney General of New Jersey, *Hal Stratton*, Attorney General of New Mexico, *Robert Abrams*, Attorney General of New York, *Lacy H. Thornburg*, Attorney General of North Carolina, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Robert H. Henry*, Attorney General of Oklahoma, *Ernest D. Preate*, Attorney General of Pennsylvania, *Hector Rivera Cruz*, Attorney General of Puerto Rico, *T. Travis Medlock*, Attorney General of South Carolina, *Roger A. Tellinghuisen*, Attorney General of South Dakota, *Charles W. Burson*, Attorney General of Tennessee, *Jim Mattox*, Attorney General of Texas, *R. Paul Van Dam*, Attorney General of Utah, *Godfrey R. de Castro*, Attorney General of the Virgin Islands, *Mary Sue Terry*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, and *Joseph B. Mayer*, Attorney General of Wyoming; for the District Attorney of Kings County, New York, et al. by *Charles J. Hynes, Peter A. Weinstein, Jay Cohen, Robert T. Johnson, Anthony Girese,* and *Howard R. Relin;* for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* for the National Association of Counsel for Children et al. by *Jacqueline Y. Parker, Philip J. McCarthy, Jr.*,

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to decide whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television.

I

In October 1986, a Howard County grand jury charged respondent, Sandra Ann Craig, with child abuse, first and second degree sexual offenses, perverted sexual practice, assault, and battery. The named victim in each count was a 6-year-old girl who, from August 1984 to June 1986, had attended a kindergarten and prekindergarten center owned and operated by Craig.

In March 1987, before the case went to trial, the State sought to invoke a Maryland statutory procedure that permits a judge to receive, by one-way closed circuit television, the testimony of a child witness who is alleged to be a victim of child abuse.[1] To invoke the procedure, the

and *Thomas R. Finn;* for People Against Child Abuse by *Judith D. Schretter, Wallace A. Christensen,* and *Paul A. Dorf;* and for the Stephanie Roper Foundation by *Gary B. Born.*

Briefs of *amici curiae* urging affirmance were filed for the Illinois Public Defender Association et al. by *David P. Bergschneider;* for the National Association of Criminal Defense Lawyers by *Maria Cristina Gutierrez* and *Annabelle Whiting Hall;* and for Victims of Child Abuse Laws National Network (Vocal) by *Alan Silber.*

Briefs of *amici curiae* were filed for the American Psychological Association by *David W. Ogden;* for the Appellate Committee of the California District Attorney's Association by *Jonathan B. Conklin;* for the Institute for Psychological Therapies by *Louis Kiefer;* and for Richard A. Gardner by *Alan Silber.*

[1] Maryland Cts. & Jud. Proc. Code Ann. § 9–102 (1989) provides in full:

"(a)(1) In a case of abuse of a child as defined in § 5–701 of the Family Law Article or Article 27, § 35A of the Code, a court may order that the testimony of a child victim be taken outside the courtroom and shown in the courtroom by means of a closed circuit television if:

"(i) The testimony is taken during the proceeding; and

trial judge must first "determin[e] that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." Md. Cts. & Jud. Proc. Code Ann. § 9–102(a)(1)(ii) (1989). Once the procedure is invoked, the child witness, prosecutor, and defense counsel withdraw to a separate room; the judge, jury, and defendant remain in the courtroom. The child witness is then examined and cross-examined in the separate room, while a video monitor records and displays the witness' testimony to those in the courtroom. During this time the witness cannot see the de-

"(ii) The judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate.

"(2) Only the prosecuting attorney, the attorney for the defendant, and the judge may question the child.

"(3) The operators of the closed circuit television shall make every effort to be unobtrusive.

"(b)(1) Only the following persons may be in the room with the child when the child testifies by closed circuit television:

"(i) The prosecuting attorney;

"(ii) The attorney for the defendant;

"(iii) The operators of the closed circuit television equipment; and

"(iv) Unless the defendant objects, any person whose presence, in the opinion of the court, contributes to the well-being of the child, including a person who has dealt with the child in a therapeutic setting concerning the abuse.

"(2) During the child's testimony by closed circuit television, the judge and the defendant shall be in the courtroom.

"(3) The judge and the defendant shall be allowed to communicate with the persons in the room where the child is testifying by any appropriate electronic method.

"(c) The provisions of this section do not apply if the defendant is an attorney pro se.

"(d) This section may not be interpreted to preclude, for purposes of identification of a defendant, the presence of both the victim and the defendant in the courtroom at the same time."

For a detailed description of the § 9–102 procedure, see *Wildermuth* v. *State*, 310 Md. 496, 503–504, 530 A. 2d 275, 278–279 (1987).

fendant. The defendant remains in electronic communication with defense counsel, and objections may be made and ruled on as if the witness were testifying in the courtroom.

In support of its motion invoking the one-way closed circuit television procedure, the State presented expert testimony that the named victim, as well as a number of other children who were alleged to have been sexually abused by Craig, would suffer "serious emotional distress such that [they could not] reasonably communicate," § 9–102(a)(1)(ii), if required to testify in the courtroom. App. 7–59. The Maryland Court of Appeals characterized the evidence as follows:

> "The expert testimony in each case suggested that each child would have some or considerable difficulty in testifying in Craig's presence. For example, as to one child, the expert said that what 'would cause him the most anxiety would be to testify in front of Mrs. Craig. . . .' The child 'wouldn't be able to communicate effectively.' As to another, an expert said she 'would probably stop talking and she would withdraw and curl up.' With respect to two others, the testimony was that one would 'become highly agitated, that he may refuse to talk or if he did talk, that he would choose his subject regardless of the questions' while the other would 'become extremely timid and unwilling to talk.'" 316 Md. 551, 568–569, 560 A. 2d 1120, 1128–1129 (1989).

Craig objected to the use of the procedure on Confrontation Clause grounds, but the trial court rejected that contention, concluding that although the statute "take[s] away the right of the defendant to be face to face with his or her accuser," the defendant retains the "essence of the right of confrontation," including the right to observe, cross-examine, and have the jury view the demeanor of the witness. App. 65–66. The trial court further found that, "based upon the evidence presented . . . the testimony of each of these children in a courtroom will result in each child suffering serious emotional distress . . . such that each of these children cannot reason-

ably communicate." *Id.*, at 66. The trial court then found the named victim and three other children competent to testify and accordingly permitted them to testify against Craig via the one-way closed circuit television procedure. The jury convicted Craig on all counts, and the Maryland Court of Special Appeals affirmed the convictions, 76 Md. App. 250, 544 A. 2d 784 (1988).

The Court of Appeals of Maryland reversed and remanded for a new trial. 316 Md. 551, 560 A. 2d 1120 (1989). The Court of Appeals rejected Craig's argument that the Confrontation Clause requires in all cases a face-to-face courtroom encounter between the accused and his accusers, *id.*, at 556–562, 560 A. 2d, at 1122–1125, but concluded:

> "[U]nder § 9–102(a)(1)(ii), the operative 'serious emotional distress' which renders a child victim unable to 'reasonably communicate' must be determined to arise, at least primarily, from face-to-face confrontation with the defendant. Thus, we construe the phrase 'in the courtroom' as meaning, for sixth amendment and [state constitution] confrontation purposes, 'in the courtroom in the presence of the defendant.' Unless prevention of 'eyeball-to-eyeball' confrontation is necessary to obtain the trial testimony of the child, the defendant cannot be denied that right." *Id.*, at 566, 560 A. 2d, at 1127.

Reviewing the trial court's finding and the evidence presented in support of the § 9–102 procedure, the Court of Appeals held that, "as [it] read *Coy* [v. *Iowa*, 487 U. S. 1012 (1988)], the showing made by the State was insufficient to reach the high threshold required by that case before § 9–102 may be invoked." *Id.*, at 554–555, 560 A. 2d, at 1121 (footnote omitted).

We granted certiorari to resolve the important Confrontation Clause issues raised by this case. 493 U. S. 104 (1990).

## II

The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

We observed in *Coy* v. *Iowa* that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." 487 U. S., at 1016 (citing *Kentucky* v. *Stincer*, 482 U. S. 730, 748, 749–750 (1987) (MARSHALL, J., dissenting)); see also *Pennsylvania* v. *Ritchie*, 480 U. S. 39, 51 (1987) (plurality opinion); *California* v. *Green*, 399 U. S. 149, 157 (1970); *Snyder* v. *Massachusetts*, 291 U. S. 97, 106 (1934); *Dowdell* v. *United States*, 221 U. S. 325, 330 (1911); *Kirby* v. *United States*, 174 U. S. 47, 55 (1899); *Mattox* v. *United States*, 156 U. S. 237, 244 (1895). This interpretation derives not only from the literal text of the Clause, but also from our understanding of its historical roots. See *Coy, supra,* at 1015–1016; *Mattox, supra,* at 242 (Confrontation Clause intended to prevent conviction by affidavit); *Green, supra,* at 156 (same); cf. 3 J. Story, Commentaries on the Constitution § 1785, p. 662 (1833).

We have never held, however, that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial. Indeed, in *Coy* v. *Iowa,* we expressly "le[ft] for another day . . . the question whether any exceptions exist" to the "irreducible literal meaning of the Clause: 'a right to *meet face to face* all those who appear and give evidence *at trial.*'" 487 U. S., at 1021 (quoting *Green, supra,* at 175 (Harlan, J., concurring)). The procedure challenged in *Coy* involved the placement of a screen that prevented two child witnesses in a child abuse case from seeing the defendant as they testified against him at trial. See 487 U. S., at 1014–1015. In holding that the use of this procedure violated the defendant's right to confront witnesses against him, we suggested that

any exception to the right "would surely be allowed only when necessary to further an important public policy"—*i. e.*, only upon a showing of something more than the generalized, "legislatively imposed presumption of trauma" underlying the statute at issue in that case. *Id.*, at 1021; see also *id.*, at 1025 (O'CONNOR, J., concurring). We concluded that "[s]ince there ha[d] been no individualized findings that these particular witnesses needed special protection, the judgment [in the case before us] could not be sustained by any conceivable exception." *Id.*, at 1021. Because the trial court in this case made individualized findings that each of the child witnesses needed special protection, this case requires us to decide the question reserved in *Coy*.

The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. The word "confront," after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness. As we noted in our earliest case interpreting the Clause:

> "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox, supra*, at 242–243.

As this description indicates, the right guaranteed by the Confrontation Clause includes not only a "personal examination," 156 U. S., at 242, but also "(1) insures that the witness will give his statements under oath—thus impressing him with

the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Green, supra,* at 158 (footnote omitted).

The combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings. See *Stincer, supra,* at 739 ("[T]he right to confrontation is a functional one for the purpose of promoting reliability in a criminal trial"); *Dutton* v. *Evans,* 400 U. S. 74, 89 (1970) (plurality opinion) ("[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the [testimony]' "); *Lee* v. *Illinois,* 476 U. S. 530, 540 (1986) (confrontation guarantee serves "symbolic goals" and "promotes reliability"); see also *Faretta* v. *California,* 422 U. S. 806, 818 (1975) (Sixth Amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it"); *Strickland* v. *Washington,* 466 U. S. 668, 684–685 (1984).

We have recognized, for example, that face-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person. See *Coy, supra,* at 1019–1020 ("It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' . . . That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or

reveal the child coached by a malevolent adult"); *Ohio* v. *Roberts*, 448 U. S. 56, 63, n. 6 (1980); see also 3 W. Blackstone, Commentaries *373–*374. We have also noted the strong symbolic purpose served by requiring adverse witnesses at trial to testify in the accused's presence. See *Coy*, 487 U. S., at 1017 ("[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution'") (quoting *Pointer* v. *Texas*, 380 U. S. 400, 404 (1965)).

Although face-to-face confrontation forms "the core of the values furthered by the Confrontation Clause," *Green*, 399 U. S., at 157, we have nevertheless recognized that it is not the *sine qua non* of the confrontation right. See *Delaware* v. *Fensterer*, 474 U. S. 15, 22 (1985) *(per curiam)* ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities [such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony"); *Roberts, supra,* at 69 (oath, cross-examination, and demeanor provide "all that the Sixth Amendment demands: 'substantial compliance with the purposes behind the confrontation requirement'") (quoting *Green, supra,* at 166); see also *Stincer,* 482 U. S., at 739–744 (confrontation right not violated by exclusion of defendant from competency hearing of child witnesses, where defendant had opportunity for full and effective cross-examination at trial); *Davis* v. *Alaska,* 415 U. S. 308, 315–316 (1974); *Douglas* v. *Alabama,* 380 U. S. 415, 418 (1965); *Pointer, supra,* at 406–407; 5 J. Wigmore, Evidence § 1395, p. 150 (J. Chadbourn rev. 1974).

For this reason, we have never insisted on an actual face-to-face encounter at trial in *every* instance in which testimony is admitted against a defendant. Instead, we have repeatedly held that the Clause permits, where necessary, the admission of certain hearsay statements against a defendant de-

spite the defendant's inability to confront the declarant at trial. See, *e. g.*, *Mattox*, 156 U. S., at 243 ("[T]here could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations"); *Pointer*, *supra*, at 407 (noting exceptions to the confrontation right for dying declarations and "other analogous situations"). In *Mattox*, for example, we held that the testimony of a Government witness at a former trial against the defendant, where the witness was fully cross-examined but had died after the first trial, was admissible in evidence against the defendant at his second trial. See 156 U. S., at 240–244. We explained:

> "There is doubtless reason for saying that . . . if notes of [the witness'] testimony are permitted to be read, [the defendant] is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused." *Id.*, at 243.

We have accordingly stated that a literal reading of the Confrontation Clause would "abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." *Roberts*, 448 U. S., at 63. Thus, in certain narrow circumstances, "competing interests, if 'closely examined,' may warrant dispensing with confrontation at trial." *Id.*, at 64 (quoting *Chambers* v. *Mississippi*, 410 U. S. 284, 295 (1973), and citing *Mattox*, *supra*). We have recently held,

for example, that hearsay statements of nontestifying co-conspirators may be admitted against a defendant despite the lack of any face-to-face encounter with the accused. See *Bourjaily* v. *United States*, 483 U. S. 171 (1987); *United States* v. *Inadi*, 475 U. S. 387 (1986). Given our hearsay cases, the word "confronted," as used in the Confrontation Clause, cannot simply mean face-to-face confrontation, for the Clause would then, contrary to our cases, prohibit the admission of any accusatory hearsay statement made by an absent declarant—a declarant who is undoubtedly as much a "witness against" a defendant as one who actually testifies at trial.

In sum, our precedents establish that "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," *Roberts, supra,* at 63 (emphasis added; footnote omitted), a preference that "must occasionally give way to considerations of public policy and the necessities of the case," *Mattox, supra,* at 243. "[W]e have attempted to harmonize the goal of the Clause—placing limits on the kind of evidence that may be received against a defendant—with a societal interest in accurate factfinding, which may require consideration of out-of-court statements." *Bourjaily, supra,* at 182. We have accordingly interpreted the Confrontation Clause in a manner sensitive to its purposes and sensitive to the necessities of trial and the adversary process. See, *e. g., Kirby,* 174 U. S., at 61 ("It is scarcely necessary to say that to the rule that an accused is entitled to be confronted with witnesses against him the admission of dying declarations is an exception which arises from the necessity of the case"); *Chambers, supra,* at 295 ("Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process"). Thus, though we reaffirm the importance of face-to-face confrontation with witnesses appearing at trial, we cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee

of the right to confront one's accusers. Indeed, one commentator has noted that "[i]t is all but universally assumed that there are circumstances that excuse compliance with the right of confrontation." Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One, 8 Crim. L. Bull. 99, 107–108 (1972).

This interpretation of the Confrontation Clause is consistent with our cases holding that other Sixth Amendment rights must also be interpreted in the context of the necessities of trial and the adversary process. See, *e. g., Illinois* v. *Allen,* 397 U. S. 337, 342–343 (1970) (right to be present at trial not violated where trial judge removed defendant for disruptive behavior); *Ritchie,* 480 U. S., at 51–54 (plurality opinion) (right to cross-examination not violated where State denied defendant access to investigative files); *Taylor* v. *Illinois,* 484 U. S. 400, 410–416 (1988) (right to compulsory process not violated where trial judge precluded testimony of a surprise defense witness); *Perry* v. *Leeke,* 488 U. S. 272, 280–285 (1989) (right to effective assistance of counsel not violated where trial judge prevented testifying defendant from conferring with counsel during a short break in testimony). We see no reason to treat the face-to-face component of the confrontation right any differently, and indeed we think it would be anomalous to do so.

That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with. As we suggested in *Coy,* our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured. See 487 U. S., at 1021 (citing *Roberts, supra,* at 64; *Chambers, supra,* at 295); *Coy, supra,* at 1025 (O'CONNOR, J., concurring).

## III

Maryland's statutory procedure, when invoked, prevents a child witness from seeing the defendant as he or she testifies against the defendant at trial. We find it significant, however, that Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony. These safeguards of reliability and adversariness render the use of such a procedure a far cry from the undisputed prohibition of the Confrontation Clause: trial by *ex parte* affidavit or inquisition, see *Mattox*, 156 U. S., at 242; see also *Green*, 399 U. S., at 179 (Harlan, J., concurring) ("[T]he Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses"). Rather, we think these elements of effective confrontation not only permit a defendant to "confound and undo the false accuser, or reveal the child coached by a malevolent adult," *Coy, supra*, at 1020, but may well aid a defendant in eliciting favorable testimony from the child witness. Indeed, to the extent the child witness' testimony may be said to be technically given out of court (though we do not so hold), these assurances of reliability and adversariness are far greater than those required for admission of hearsay testimony under the Confrontation Clause. See *Roberts*, 448

U. S., at 66. We are therefore confident that use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause.

The critical inquiry in this case, therefore, is whether use of the procedure is necessary to further an important state interest. The State contends that it has a substantial interest in protecting children who are allegedly victims of child abuse from the trauma of testifying against the alleged perpetrator and that its statutory procedure for receiving testimony from such witnesses is necessary to further that interest.

We have of course recognized that a State's interest in "the protection of minor victims of sex crimes from further trauma and embarrassment" is a "compelling" one. *Globe Newspaper Co.* v. *Superior Court of Norfolk County*, 457 U. S. 596, 607 (1982); see also *New York* v. *Ferber*, 458 U. S. 747, 756–757 (1982); *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 749–750 (1978); *Ginsberg* v. *New York*, 390 U. S. 629, 640 (1968); *Prince* v. *Massachusetts*, 321 U. S. 158, 168 (1944). "[W]e have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Ferber, supra,* at 757. In *Globe Newspaper,* for example, we held that a State's interest in the physical and psychological well-being of a minor victim was sufficiently weighty to justify depriving the press and public of their constitutional right to attend criminal trials, where the trial court makes a case-specific finding that closure of the trial is necessary to protect the welfare of the minor. See 457 U. S., at 608–609. This Term, in *Osborne* v. *Ohio,* 495 U. S. 103 (1990), we upheld a state statute that proscribed the possession and viewing of child pornography, reaffirming that "'[i]t is evident beyond the need for elaboration that a State's interest in "safeguarding the physical and

psychological well-being of a minor" is "compelling.""" *Id.*, at 109 (quoting *Ferber, supra,* at 756–757).

We likewise conclude today that a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court. That a significant majority of States have enacted statutes to protect child witnesses from the trauma of giving testimony in child abuse cases attests to the widespread belief in the importance of such a public policy. See *Coy,* 487 U. S., at 1022–1023 (O'CONNOR, J., concurring) ("Many States have determined that a child victim may suffer trauma from exposure to the harsh atmosphere of the typical courtroom and have undertaken to shield the child through a variety of ameliorative measures"). Thirty-seven States, for example, permit the use of videotaped testimony of sexually abused children;[2] 24 States have authorized the use of one-way

---

[2] See Ala. Code § 15-25-2 (Supp. 1989); Ariz. Rev. Stat. Ann. §§ 13-4251 and 4253(B), (C) (1989); Ark. Code Ann. § 16-44-203 (1987); Cal. Penal Code Ann. § 1346 (West Supp. 1990); Colo. Rev. Stat. §§ 18-3-413 and 18-6-401.3 (1986); Conn. Gen. Stat. § 54-86g (1989); Del. Code Ann., Tit. 11, § 3511 (1987); Fla. Stat. § 92.53 (1989); Haw. Rev. Stat., ch. 626, Rule Evid. 616 (1985); Ill. Rev. Stat., ch. 38, ¶ 106A-2 (1989); Ind. Code §§ 35-37-4-8(c), (d), (f), (g) (1988); Iowa Code § 910A.14 (1987); Kan. Stat. Ann. § 38-1558 (1986); Ky. Rev. Stat. Ann. § 421.350(4) (Baldwin Supp. 1989); Mass. Gen. Laws § 278:16D (Supp. 1990); Mich. Comp. Laws Ann. § 600.2163a(5) (Supp. 1990); Minn. Stat. § 595.02(4) (1988); Miss. Code Ann. § 13-1-407 (Supp. 1989); Mo. Rev. Stat. §§ 491.675-491.690 (1986); Mont. Code Ann. §§ 46-15-401 to 46-15-403 (1989); Neb. Rev. Stat. § 29-1926 (1989); Nev. Rev. Stat. § 174.227 (1989); N. H. Rev. Stat. Ann. § 517:13-a (Supp. 1989); N. M. Stat. Ann. § 30-9-17 (1984); Ohio Rev. Code Ann. §§ 2907.41(A), (B), (D), (E) (1987); Okla. Stat., Tit. 22, § 753(c) (Supp. 1988); Ore. Rev. Stat. § 40.460(24) (1989); 42 Pa. Cons. Stat. §§ 5982, 5984 (1988); R. I. Gen. Laws § 11-37-13.2 (Supp. 1989); S. C. Code Ann. § 16-3-1530(G) (1985); S. D. Codified Laws § 23A-12-9 (1988); Tenn. Code Ann. §§ 24-7-116(d), (e), (f) (Supp. 1989); Tex. Code Crim. Proc. Ann., Art. 38.071, § 4 (Vernon Supp. 1990); Utah Rule Crim. Proc. 15.5 (1990); Vt. Rule Evid. 807(d) (Supp. 1989); Wis. Stat. §§ 967.04(7) to (10) (1987–1988); Wyo. Stat. § 7-11-408 (1987).

closed circuit television testimony in child abuse cases;[3] and 8 States authorize the use of a two-way system in which the child witness is permitted to see the courtroom and the defendant on a video monitor and in which the jury and judge are permitted to view the child during the testimony.[4]

The statute at issue in this case, for example, was specifically intended "to safeguard the physical and psychological well-being of child victims by avoiding, or at least minimizing, the emotional trauma produced by testifying." *Wildermuth* v. *State*, 310 Md. 496, 518, 530 A. 2d 275, 286 (1987). The *Wildermuth* court noted:

> "In Maryland, the Governor's Task Force on Child Abuse in its *Interim Report* (Nov. 1984) documented the existence of the [child abuse] problem in our State. *Interim Report* at 1. It brought the picture up to date in its *Final Report* (Dec. 1985). In the first six months of 1985, investigations of child abuse were 12 percent more numerous than during the same period of 1984. In 1979 4,615 cases of child abuse were investigated; in 1984,

---

[3] See Ala. Code § 15–25–3 (Supp. 1989); Alaska Stat. Ann. § 12.45.046 (Supp. 1989); Ariz. Rev. Stat. Ann. § 13–4253 (1989); Conn. Gen. Stat. § 54–86g (1989); Fla. Stat. § 92.54 (1989); Ga. Code Ann. § 17–8–55 (Supp. 1989); Ill. Rev. Stat., ch. 38, ¶ 106A–3 (1987); Ind. Code § 35–37–4–8 (1988); Iowa Code § 910A–14 (Supp. 1990); Kan. Stat. Ann. § 38–1558 (1986); Ky. Rev. Stat. Ann. §§ 421–350(1), (3) (Baldwin Supp. 1989); La. Rev. Stat. Ann. § 15:283 (West Supp. 1990); Md. Cts. & Jud. Proc. Code Ann. § 9–102 (1989); Mass. Gen. Laws § 278:16D (Supp. 1990); Minn. Stat. § 595.02(4) (1988); Miss. Code Ann. § 13–1–405 (Supp. 1989); N. J. Stat. Ann. § 2A:84A–32.4 (West Supp. 1989); Okla. Stat., Tit. 22, § 753(b) (Supp. 1988); Ore. Rev. Stat. § 40.460(24) (1989); 42 Pa. Cons. Stat. §§ 5982, 5985 (1988); R. I. Gen. Laws § 11–37–13.2 (Supp. 1989); Tex. Code Crim. Proc. Ann., Art. 38.071, § 3 (Vernon Supp. 1990); Utah Rule Crim. Proc. 15.5 (1990); Vt. Rule Evid. 807(d) (Supp. 1989).

[4] See Cal. Penal Code Ann. § 1347 (West Supp. 1990); Haw. Rev. Stat., ch. 626, Rule Evid. 616 (1985); Idaho Code § 19–3024A (Supp. 1989); Minn. Stat. § 595.02(4)(c)(2) (1988); N. Y. Crim. Proc. Law §§ 65.00 to 65.30 (McKinney Supp. 1990); Ohio Rev. Code Ann. §§ 2907.41(C), (E) (1987); Va. Code Ann. § 18.2–67.9 (1988); Vt. Rule Evid. 807(e) (Supp. 1989).

8,321. *Final Report* at iii. In its *Interim Report* at 2, the Commission proposed legislation that, with some changes, became § 9–102. The proposal was 'aimed at alleviating the trauma to a child victim in the courtroom atmosphere by allowing the child's testimony to be obtained outside of the courtroom.' *Id.*, at 2. This would both protect the child and enhance the public interest by encouraging effective prosecution of the alleged abuser." *Id.*, at 517, 530 A. 2d, at 285.

Given the State's traditional and "'transcendent interest in protecting the welfare of children,'" *Ginsberg*, 390 U. S., at 640 (citation omitted), and buttressed by the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court, see Brief for American Psychological Association as *Amicus Curiae* 7–13; G. Goodman et al., Emotional Effects of Criminal Court Testimony on Child Sexual Assault Victims, Final Report to the National Institute of Justice (presented as conference paper at annual convention of American Psychological Assn., Aug. 1989), we will not second-guess the considered judgment of the Maryland Legislature regarding the importance of its interest in protecting child abuse victims from the emotional trauma of testifying. Accordingly, we hold that, if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

The requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. See *Globe Newspaper Co.*, 457 U. S., at 608–609 (compelling interest in protecting

child victims does not justify a *mandatory* trial closure rule); *Coy*, 487 U. S., at 1021; *id.*, at 1025 (O'CONNOR, J., concurring); see also *Hochheiser* v. *Superior Court*, 161 Cal. App. 3d 777, 793, 208 Cal. Rptr. 273, 283 (1984). The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. See, *e. g.*, *State* v. *Wilhite*, 160 Ariz. 228, 772 P. 2d 582 (1989); *State* v. *Bonello*, 210 Conn. 51, 554 A. 2d 277 (1989); *State* v. *Davidson*, 764 S. W. 2d 731 (Mo. App. 1989); *Commonwealth* v. *Ludwig*, 366 Pa. Super. 361, 531 A. 2d 459 (1987). Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis, i. e.*, more than "mere nervousness or excitement or some reluctance to testify," *Wildermuth, supra*, at 524, 530 A. 2d, at 289; see also *State* v. *Mannion*, 19 Utah 505, 511–512, 57 P. 542, 543–544 (1899). We need not decide the minimum showing of emotional trauma required for use of the special procedure, however, because the Maryland statute, which requires a determination that the child witness will suffer "serious emotional distress such that the child cannot reasonably communicate," § 9–102(a)(1)(ii), clearly suffices to meet constitutional standards.

To be sure, face-to-face confrontation may be said to cause trauma for the very purpose of eliciting truth, cf. *Coy, supra*, at 1019–1020, but we think that the use of Maryland's special procedure, where necessary to further the important state interest in preventing trauma to child witnesses in child

abuse cases, adequately ensures the accuracy of the testimony and preserves the adversary nature of the trial. See *supra*, at 851–852. Indeed, where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that such confrontation would in fact *disserve* the Confrontation Clause's truth-seeking goal. See, *e. g.*, *Coy*, *supra*, at 1032 (BLACKMUN, J., dissenting) (face-to-face confrontation "may so overwhelm the child as to prevent the possibility of effective testimony, thereby undermining the truth-finding function of the trial itself"); Brief for American Psychological Association as *Amicus Curiae* 18–24; *State* v. *Sheppard*, 197 N. J. Super. 411, 416, 484 A. 2d 1330, 1332 (1984); Goodman & Helgeson, Child Sexual Assault: Children's Memory and the Law, 40 U. Miami L. Rev. 181, 203–204 (1985); Note, Videotaping Children's Testimony: An Empirical View, 85 Mich. L. Rev. 809, 813–820 (1987).

In sum, we conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation. Because there is no dispute that the child witnesses in this case testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

## IV

The Maryland Court of Appeals held, as we do today, that although face-to-face confrontation is not an absolute constitutional requirement, it may be abridged only where there

is a "'case-specific finding of necessity.'" 316 Md., at 564, 560 A. 2d, at 1126 (quoting *Coy, supra,* at 1025 (O'CONNOR, J., concurring)). Given this latter requirement, the Court of Appeals reasoned that "[t]he question of whether a child is unavailable to testify . . . should not be asked in terms of inability to testify in the ordinary courtroom setting, but in the much narrower terms of the witness's inability to testify in the presence of the accused." 316 Md., at 564, 560 A. 2d, at 1126 (footnote omitted). "[T]he determinative inquiry required to preclude face-to-face confrontation is the effect of the presence of the defendant on the witness or the witness's testimony." *Id.,* at 565, 560 A. 2d, at 1127. The Court of Appeals accordingly concluded that, as a prerequisite to use of the § 9–102 procedure, the Confrontation Clause requires the trial court to make a specific finding that testimony by the child in the courtroom *in the presence of the defendant* would result in the child suffering serious emotional distress such that the child could not reasonably communicate. *Id.,* at 566, 560 A. 2d, at 1127. This conclusion, of course, is consistent with our holding today.

In addition, however, the Court of Appeals interpreted our decision in *Coy* to impose two subsidiary requirements. First, the court held that "§ 9–102 ordinarily cannot be invoked unless the child witness initially is questioned (either in or outside the courtroom) in the defendant's presence." *Id.,* at 566, 560 A. 2d, at 1127; see also *Wildermuth,* 310 Md., at 523–524, 530 A. 2d, at 289 (personal observation by the judge should be the rule rather than the exception). Second, the court asserted that, before using the one-way television procedure, a trial judge must determine whether a child would suffer "severe emotional distress" if he or she were to testify by *two*-way closed circuit television. 316 Md., at 567, 560 A. 2d, at 1128.

Reviewing the evidence presented to the trial court in support of the finding required under § 9–102(a)(1)(ii), the Court of Appeals determined that "the finding of necessity required

to limit the defendant's right of confrontation through invocation of § 9–102 . . . was not made here." *Id.*, at 570–571, 560 A. 2d, at 1129. The Court of Appeals noted that the trial judge "had the benefit only of expert testimony on the ability of the children to communicate; he did not question any of the children himself, nor did he observe any child's behavior on the witness stand before making his ruling. He did not explore any alternatives to the use of one-way closed-circuit television." *Id.*, at 568, 560 A. 2d, at 1128 (footnote omitted). The Court of Appeals also observed that "the testimony in this case was not sharply focused on the effect of the defendant's presence on the child witnesses." *Id.*, at 569, 560 A. 2d, at 1129. Thus, the Court of Appeals concluded:

"Unable to supplement the expert testimony by responses to questions put by him, or by his own observations of the children's behavior in Craig's presence, the judge made his § 9–102 finding in terms of what the experts had said. He ruled that 'the testimony of each of these children *in a courtroom* will [result] in each child suffering serious emotional distress . . . such that each of these children cannot reasonably communicate.' He failed to find—indeed, on the evidence before him, *could not have found*—that this result would be the product of testimony in a courtroom in the defendant's presence or outside the courtroom but in the defendant's televised presence. That, however, is the finding of necessity required to limit the defendant's right of confrontation through invocation of § 9–102. Since that finding was not made here, and since the procedures we deem requisite to the valid use of § 9–102 were not followed, the judgment of the Court of Special Appeals must be reversed and the case remanded for a new trial." *Id.*, at 570–571, 560 A. 2d, at 1129 (emphasis added).

The Court of Appeals appears to have rested its conclusion at least in part on the trial court's failure to observe the children's behavior in the defendant's presence and its failure to

explore less restrictive alternatives to the use of the one-way closed circuit television procedure. See *id.*, at 568–571, 560 A. 2d, at 1128–1129. Although we think such evidentiary requirements could strengthen the grounds for use of protective measures, we decline to establish, as a matter of federal constitutional law, any such categorical evidentiary prerequisites for the use of the one-way television procedure. The trial court in this case, for example, could well have found, on the basis of the expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence "will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate," § 9–102(a)(1)(ii). See *id.*, at 568–569, 560 A. 2d, at 1128–1129; see also App. 22–25, 39, 41, 43, 44–45, 54–57. So long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case. Because the Court of Appeals held that the trial court had not made the requisite finding of necessity under its interpretation of "the high threshold required by *[Coy]* before § 9–102 may be invoked," 316 Md., at 554–555, 560 A. 2d, at 1121 (footnote omitted), we cannot be certain whether the Court of Appeals would reach the same conclusion in light of the legal standard we establish today. We therefore vacate the judgment of the Court of Appeals of Maryland and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

Seldom has this Court failed so conspicuously to sustain a categorical guarantee of the Constitution against the tide of prevailing current opinion. The Sixth Amendment provides, with unmistakable clarity, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

with the witnesses against him." The purpose of enshrining this protection in the Constitution was to assure that none of the many policy interests from time to time pursued by statutory law could overcome a defendant's right to face his or her accusers in court. The Court, however, says:

> "We . . . conclude today that a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court. That a significant majority of States have enacted statutes to protect child witnesses from the trauma of giving testimony in child abuse cases attests to the widespread belief in the importance of such a public policy." *Ante*, at 853.

Because of this subordination of explicit constitutional text to currently favored public policy, the following scene can be played out in an American courtroom for the first time in two centuries: A father whose young daughter has been given over to the exclusive custody of his estranged wife, or a mother whose young son has been taken into custody by the State's child welfare department, is sentenced to prison for sexual abuse on the basis of testimony by a child the parent has not seen or spoken to for many months; and the guilty verdict is rendered without giving the parent so much as the opportunity to sit in the presence of the child, and to ask, personally or through counsel, "it is really not true, is it, that I—your father (or mother) whom you see before you—did these terrible things?" Perhaps that is a procedure today's society desires; perhaps (though I doubt it) it is even a fair procedure; but it is assuredly not a procedure permitted by the Constitution.

Because the text of the Sixth Amendment is clear, and because the Constitution is meant to protect against, rather than conform to, current "widespread belief," I respectfully dissent.

## I

According to the Court, "we cannot say that [face-to-face] confrontation [with witnesses appearing at trial] is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." *Ante,* at 849–850. That is rather like saying "we cannot say that being tried before a jury is an indispensable element of the Sixth Amendment's guarantee of the right to jury trial." The Court makes the impossible plausible by recharacterizing the Confrontation Clause, so that confrontation (redesignated "face-to-face confrontation") becomes only one of many "elements of confrontation." *Ante,* at 846. The reasoning is as follows: The Confrontation Clause guarantees not only what it explicitly provides for—"face-to-face" confrontation—but also implied and collateral rights such as cross-examination, oath, and observation of demeanor (TRUE); the purpose of this entire cluster of rights is to ensure the reliability of evidence (TRUE); the Maryland procedure preserves the implied and collateral rights (TRUE), which adequately ensure the reliability of evidence (perhaps TRUE); therefore the Confrontation Clause is not violated by denying what it explicitly provides for—"face-to-face" confrontation (unquestionably FALSE). This reasoning abstracts from the right to its purposes, and then eliminates the right. It is wrong because the Confrontation Clause does not guarantee reliable evidence; it guarantees specific trial procedures that were thought to *assure* reliable evidence, undeniably among which was "face-to-face" confrontation. Whatever else it may mean in addition, the defendant's constitutional right "to be confronted with the witnesses against him" means, always and everywhere, at least what it explicitly says: the "'right to meet face to face all those who appear and give evidence at trial.'" *Coy* v. *Iowa,* 487 U. S. 1012, 1016 (1988), quoting *California* v. *Green,* 399 U. S. 149, 175 (1970) (Harlan, J., concurring).

The Court supports its antitextual conclusion by cobbling together scraps of dicta from various cases that have no bearing here. It will suffice to discuss one of them, since they are all of a kind: Quoting *Ohio* v. *Roberts,* 448 U. S. 56, 63 (1980), the Court says that "[i]n sum, our precedents establish that 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,'" *ante,* at 849 (emphasis added by the Court). But *Roberts,* and all the other "precedents" the Court enlists to prove the implausible, dealt with the *implications* of the Confrontation Clause, and not its literal, unavoidable text. When *Roberts* said that the Clause merely "reflects a preference for face-to-face confrontation at trial," what it had in mind as the nonpreferred alternative was not (as the Court implies) the appearance of a witness at trial without confronting the defendant. That has been, until today, not merely "nonpreferred" but utterly unheard-of. What *Roberts* had in mind was the receipt of *other-than-first-hand testimony* from witnesses at trial—that is, witnesses' recounting of hearsay statements by absent parties who, *since they did not appear at trial,* did not have to endure face-to-face confrontation. Rejecting that, I agree, was merely giving effect to an evident constitutional preference; there are, after all, many exceptions to the Confrontation Clause's hearsay rule. But that the defendant should be confronted by the witnesses who appear at trial is not a preference "reflected" by the Confrontation Clause; it is a constitutional right unqualifiedly guaranteed.

The Court claims that its interpretation of the Confrontation Clause "is consistent with our cases holding that other Sixth Amendment rights must also be interpreted in the context of the necessities of trial and the adversary process." *Ante,* at 850. I disagree. It is true enough that the "necessities of trial and the adversary process" limit the *manner* in which Sixth Amendment rights may be exercised, and limit the *scope* of Sixth Amendment guarantees to the extent that scope is textually indeterminate. Thus (to

describe the cases the Court cites): The right to confront is not the right to confront in a manner that disrupts the trial. *Illinois* v. *Allen*, 397 U. S. 337 (1970). The right "to have compulsory process for obtaining witnesses" is not the right to call witnesses in a manner that violates fair and orderly procedures. *Taylor* v. *Illinois*, 484 U. S. 400 (1988). The scope of the right "to have the assistance of counsel" does not include consultation with counsel at all times during the trial. *Perry* v. *Leeke*, 488 U. S. 272 (1989). The scope of the right to cross-examine does not include access to the State's investigative files. *Pennsylvania* v. *Ritchie*, 480 U. S. 39 (1987). But we are not talking here about denying expansive scope to a Sixth Amendment provision whose scope for the purpose at issue is textually unclear; "to confront" plainly means to encounter face to face, whatever else it may mean in addition. And we are not talking about the manner of arranging that face-to-face encounter, but about whether it shall occur at all. The "necessities of trial and the adversary process" are irrelevant here, since they cannot alter the constitutional text.

## II

Much of the Court's opinion consists of applying to this case the mode of analysis we have used in the admission of hearsay evidence. The Sixth Amendment does not literally contain a prohibition upon such evidence, since it guarantees the defendant only the right to confront "the witnesses against him." As applied in the Sixth Amendment's context of a prosecution, the noun "witness"—in 1791 as today—could mean either (a) one "who knows or sees any thing; one personally present" or (b) "one who gives testimony" or who "testifies," *i. e.*, "[i]n *judicial proceedings*, [one who] make[s] a solemn declaration under oath, for the purpose of establishing or making proof of some fact to a court." 2 N. Webster, An American Dictionary of the English Language (1828) (emphasis added). See also J. Buchanan, Linguae Britannicae Vera Pronunciatio (1757). The former meaning (one "who

knows or sees") would cover hearsay evidence, but is excluded in the Sixth Amendment by the words following the noun: "witnesses *against him.*" The phrase obviously refers to those who give testimony against the defendant at trial. We have nonetheless found implicit in the Confrontation Clause some limitation upon hearsay evidence, since otherwise the government could subvert the confrontation right by putting on witnesses who know nothing except what an absent declarant said. And in determining the scope of that implicit limitation, we have focused upon whether the reliability of the hearsay statements (which are not *expressly* excluded by the Confrontation Clause) "is otherwise assured." *Ante,* at 850. The same test cannot be applied, however, to permit what is explicitly forbidden by the constitutional text; there is simply no room for interpretation with regard to "the irreducible literal meaning of the Clause." *Coy, supra,* at 1020–1021.

Some of the Court's analysis seems to suggest that the children's testimony here was itself hearsay of the sort permissible under our Confrontation Clause cases. See *ante,* at 851. That cannot be. Our Confrontation Clause conditions for the admission of hearsay have long included a "general requirement of unavailability" of the declarant. *Idaho* v. *Wright, ante,* at 815. "In the usual case . . . , the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Ohio* v. *Roberts,* 448 U. S., at 65. We have permitted a few exceptions to this general rule—*e. g.,* for co-conspirators' statements, whose effect cannot be replicated by live testimony because they "derive [their] significance from the circumstances in which [they were] made," *United States* v. *Inadi,* 475 U. S. 387, 395 (1986). "Live" closed-circuit television testimony, however—if it can be called hearsay at all—is surely an example of hearsay as "a weaker substitute for live testimony," *id.,* at 394, which can be employed only when the genuine article is unavailable. "When

two versions of the same evidence are available, longstanding principles of the law of hearsay, applicable as well to Confrontation Clause analysis, favor the better evidence." *Ibid.* See also *Roberts, supra* (requiring unavailability as precondition for admission of prior testimony); *Barber* v. *Page*, 390 U. S. 719 (1968) (same).

The Court's test today requires unavailability only in the sense that the child is unable to testify in the presence of the defendant.[1] That cannot possibly be the relevant sense. If unconfronted testimony is admissible hearsay when the witness is unable to confront the defendant, then presumably there are other categories of admissible hearsay consisting of unsworn testimony when the witness is unable to risk perjury, un-cross-examined testimony when the witness is unable to undergo hostile questioning, etc. *California* v. *Green*, 399 U. S. 149 (1970), is not precedent for such a silly system. That case held that the Confrontation Clause does not bar admission of prior testimony when the declarant is sworn as a witness but refuses to answer. But in *Green*, as in most cases of refusal, we could not know *why* the declarant refused to testify. Here, by contrast, we know that it is precisely because the child is unwilling to testify in the presence of the defendant. That unwillingness cannot be a valid excuse under the Confrontation Clause, whose very object is to place the witness under the sometimes hostile glare of the defendant. "That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult." *Coy,* 487

---

[1] I presume that when the Court says "trauma would impair the child's ability to communicate," *ante,* at 857, it means that trauma would make it impossible for the child to communicate. That is the requirement of the Maryland law at issue here: "serious emotional distress such that the child cannot reasonably communicate." Md. Cts. & Jud. Proc. Code Ann. § 9–102(a)(1)(ii) (1989). Any implication beyond that would in any event be dictum.

U. S., at 1020.   To say that a defendant loses his right to confront a witness when that would cause the witness not to testify is rather like saying that the defendant loses his right to counsel when counsel would save him, or his right to subpoena witnesses when they would exculpate him, or his right not to give testimony against himself when that would prove him guilty.

### III

The Court characterizes the State's interest which "outweigh[s]" the explicit text of the Constitution as an "interest in the physical and psychological well-being of child abuse victims," *ante*, at 853, an "interest in protecting" such victims "from the emotional trauma of testifying," *ante*, at 855. That is not so.   A child who meets the Maryland statute's requirement of suffering such "serious emotional distress" from confrontation that he "cannot reasonably communicate" would seem entirely safe.   Why would a prosecutor want to call a witness who cannot reasonably communicate?   And if he did, it would be the State's own fault.   Protection of the child's interest—as far as the Confrontation Clause is concerned[2]—is entirely within Maryland's control.   The State's interest here is in fact no more and no less than what the State's interest always is when it seeks to get a class of evidence admitted in criminal proceedings: more convictions of guilty defendants.   That is not an unworthy interest, but it should not be dressed up as a humanitarian one.

And the interest on the other side is also what it usually is when the State seeks to get a new class of evidence admitted: fewer convictions of innocent defendants—specifically, in the

---

[2] A different situation would be presented if the defendant sought to call the child.   In that event, the State's refusal to compel the child to appear, or its insistence upon a procedure such as that set forth in the Maryland statute as a condition of its compelling him to do so, would call into question—initially, at least, and perhaps exclusively—the scope of the defendant's Sixth Amendment right "to have compulsory process for obtaining witnesses in his favor."

present context, innocent defendants accused of particularly heinous crimes. The "special" reasons that exist for suspending one of the usual guarantees of reliability in the case of children's testimony are perhaps matched by "special" reasons for being particularly insistent upon it in the case of children's testimony. Some studies show that children are substantially more vulnerable to suggestion than adults, and often unable to separate recollected fantasy (or suggestion) from reality. See Lindsay & Johnson, Reality Monitoring and Suggestibility: Children's Ability to Discriminate Among Memories From Different Sources, in Children's Eyewitness Memory 92 (S. Ceci, M. Toglia, & D. Ross eds. 1987); Feher, The Alleged Molestation Victim, The Rules of Evidence, and the Constitution: Should Children Really Be Seen and Not Heard?, 14 Am. J. Crim. L. 227, 230–233 (1987); Christiansen, The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews, 62 Wash. L. Rev. 705, 708–711 (1987). The injustice their erroneous testimony can produce is evidenced by the tragic Scott County investigations of 1983–1984, which disrupted the lives of many (as far as we know) innocent people in the small town of Jordan, Minnesota. At one stage those investigations were pursuing allegations by at least eight children of multiple murders, but the prosecutions actually initiated charged only sexual abuse. Specifically, 24 adults were charged with molesting 37 children. In the course of the investigations, 25 children were placed in foster homes. Of the 24 indicted defendants, one pleaded guilty, two were acquitted at trial, and the charges against the remaining 21 were voluntarily dismissed. See Feher, *supra*, at 239–240. There is no doubt that some sexual abuse took place in Jordan; but there is no reason to believe it was as widespread as charged. A report by the Minnesota attorney general's office, based on inquiries conducted by the Minnesota Bureau of Criminal Apprehension and the Federal Bureau of Investigation, concluded that there was an "absence of credible testimony and [a] lack of

significant corroboration" to support reinstitution of sex-abuse charges, and "no credible evidence of murders." H. Humphrey, Report on Scott County Investigation 8, 7 (1985). The report describes an investigation full of well-intentioned techniques employed by the prosecution team, police, child protection workers, and foster parents, that distorted and in some cases even coerced the children's recollection. Children were interrogated repeatedly, in some cases as many as 50 times, *id.*, at 9; answers were suggested by telling the children what other witnesses had said, *id.*, at 11; and children (even some who did not at first complain of abuse) were separated from their parents for months, *id.*, at 9. The report describes the consequences as follows:

> "As children continued to be interviewed the list of accused citizens grew. In a number of cases, it was only after weeks or months of questioning that children would 'admit' their parents abused them.
>
> .           .           .           .           .
>
> "In some instances, over a period of time, the allegations of sexual abuse turned to stories of mutilations, and eventually homicide." *Id.*, at 10–11.

The value of the confrontation right in guarding against a child's distorted or coerced recollections is dramatically evident with respect to one of the misguided investigative techniques the report cited: some children were told by their foster parents that reunion with their real parents would be hastened by "admission" of their parents' abuse. *Id.*, at 9. Is it difficult to imagine how unconvincing such a testimonial admission might be to a jury that witnessed the child's delight at seeing his parents in the courtroom? Or how devastating it might be if, pursuant to a psychiatric evaluation that "trauma would impair the child's ability to communicate" in front of his parents, the child were permitted to tell his story to the jury on closed-circuit television?

In the last analysis, however, this debate is not an appropriate one. I have no need to defend the value of confronta-

tion, because the Court has no authority to question it. It is not within our charge to speculate that, "where face-to-face confrontation causes significant emotional distress in a child witness," confrontation might "in fact *disserve* the Confrontation Clause's truth-seeking goal." *Ante*, at 857. If so, that is a defect in the Constitution—which should be amended by the procedures provided for such an eventuality, but cannot be corrected by judicial pronouncement that it is archaic, contrary to "widespread belief," and thus null and void. For good or bad, the Sixth Amendment requires confrontation, and we are not at liberty to ignore it. To quote the document one last time (for it plainly says all that need be said): "In *all* criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him" (emphasis added).

\*    \*    \*

The Court today has applied "interest-balancing" analysis where the text of the Constitution simply does not permit it. We are not free to conduct a cost-benefit analysis of clear and explicit constitutional guarantees, and then to adjust their meaning to comport with our findings. The Court has convincingly proved that the Maryland procedure serves a valid interest, and gives the defendant virtually everything the Confrontation Clause guarantees (everything, that is, except confrontation). I am persuaded, therefore, that the Maryland procedure is virtually constitutional. Since it is not, however, actually constitutional I would affirm the judgment of the Maryland Court of Appeals reversing the judgment of conviction.