517 S.E.2d 714

**The STATE of South Carolina, Respondent,**

v.

**Gary Douglas BRAY, Appellant.**

**No. 2993.**

Court of Appeals of South Carolina.

Heard April 13, 1999.

Decided May 10, 1999.

Rehearing Denied June 26, 1999.

Certiorari Granted Nov. 5, 1999.

---

516

Peter F. Them, II, of Summerville, for appellant.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney Gener-

al Salley W. Elliott and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor Walter M. Bailey, Jr., of Summerville, for respondent.

HEARN, Judge:

Gary Douglas Bray appeals his conviction for first degree criminal sexual conduct with a minor. We reverse and remand for a new trial.

## FACTS/PROCEDURAL BACKGROUND

Bray is the uncle of the alleged child victim in this case. The child and her mother, who is Bray's sister, often spent weekends at the child's maternal grandmother's home in 1995 and early 1996. Bray lived in the grandmother's home.

The child, who was five at the time of the alleged abuse and seven at the time of trial, testified that she often played with Bray in his room when she stayed at her grandmother's house. The child's mother stated her daughter loved to play with Bray in his room, that they would often play until bedtime, that Bray's door would be closed while they played, and that sometimes it would be locked.

The child testified that Bray touched her in a bad way. She testified he touched her "pee pee" and her "bottom" with his finger and his tongue, and Bray had her rub his "front private." She stated she wet her hands in the bathroom adjoining Bray's bedroom and would then rub his penis. She testified that "we had to keep on doing it and doing it and doing it until this white stuff came out." Afterward, she remembers Bray wiped the "white stuff" onto a clean t-shirt.

Bray admitted owning three pornographic magazines. The child testified he showed her the magazines, and she remembered seeing "white stuff" on one woman's belly. Bray, on the other hand, testified that the child was naturally inquisitive and would "go through about anything she wanted to go through." One day he entered his bedroom and found her looking at the magazines, which he kept under his bed. He attempted to answer the child's questions about the pictures, including a question about the "white stuff," and hoped that would end the situation. He knew there would be trouble if

the child's grandmother discovered he had pornographic magazines in the house.

The child did not tell anyone for some time about the "secret" she had with Bray, so the exact dates of the alleged abuse are unknown. She testified she told her grandmother, who did not take any action.[1] Soon thereafter, she told her parents about seeing photographs of undressed people in magazines and asked them, "What is having sex?" Her mother was immediately concerned and took the child to counseling to determine whether she was a victim of sexual abuse.

The child was initially seen by a counselor on March 28, 1996. After one meeting, the counselor suggested the child be evaluated at the Lowcountry Children's Center ("LCC") in Charleston. During a forensic interview with a therapist at LCC on April 2, 1996, the child first stated Bray had touched her "privates" and she touched his while at her grandmother's house. Based upon that interview, LCC made a police report of sexual abuse. A medical examination at LCC on April 2 was inconclusive.

Bray was indicted on one count of first degree criminal sexual conduct. The trial judge held an *in camera* hearing to decide whether the child should testify via closed circuit television ("CCTV"). After taking testimony from the child's therapist and the child's mother, but without interviewing the child herself, the trial judge allowed the CCTV testimony over defense objections. The jury returned a guilty verdict, and the trial court sentenced Bray to thirty years imprisonment. The court provided that upon service of seven years the remainder of the sentence would be suspended and that Bray would be placed on probation for five years. This appeal followed.

---

1. Apparently, the allegations of abuse in this case have divided this family. The mother, father, and child believe the abuse happened, while the remainder of the family, including the grandmother and Bray's other siblings, believe the abuse is a fabrication. The grandmother testified that although the child once said, "Uncle Gary and I have a secret," the child never told her what the secret was and never said Bray touched her private parts in a sexual way.

## LAW/ANALYSIS

■ Bray argues the trial court failed to comply with the procedures set forth in *State v. Murrell*, 302 S.C. 77, 393 S.E.2d 919 (1990), and its progeny and thus violated his constitutional right to confront the witnesses against him. He complains the trial court's factual finding regarding the necessity for the child to testify via CCTV was not supported by sufficient evidence. We agree.

■ In *Murrell*, our supreme court described the procedure to be followed by trial courts in invoking South Carolina Code section 16–3–1550(E) (Supp.1998),[2] to protect child witnesses. This subsection concerns the need to treat certain witnesses, including the very young, sensitively and allows closed or taped testimony when appropriate. The court in *Murrell* explained the guidelines to be followed:

First, the trial judge must make a case-specific determination of the need for videotaped testimony. In making this determination, the trial court should consider the testimony of an expert witness, parents or other relatives, other concerned and relevant parties, and the child. Second, the court should place the child in as close to a courtroom setting as possible. Third, the defendant should be able to see and hear the child, should have counsel present both in the courtroom and with him, and communication should be available between counsel and appellant.

*Id.* at 80–81, 393 S.E.2d at 921 (footnote omitted). A trial court's decision to allow testimony via CCTV may be reversed only upon a showing that the trial court abused its discretion in making the decision or in implementing the appropriate procedure once the decision has been made. *Id.* at 82, 393 S.E.2d at 922.

■ The first prong of the *Murrell* test requires a case-specific factual inquiry into the necessity for the child to testify via CCTV. The evidence supporting a finding of the need for CCTV or videotaped testimony must be more than *de minimis*. *State v. Lewis*, 324 S.C. 539, 545, 478 S.E.2d 861, 864 (Ct.App.1996), *cert. denied*, (June 5, 1997).

---

2. This statutory provision has been recodified from its former location at South Carolina Code section 16–3–1530(G) (1985).

During the hearing to consider whether to allow the child to testify outside Bray's presence, the State offered testimony from the child's therapist, Kim Charpia, who had seen the child eight times. When asked whether the child would be able to testify in open court in front of Bray, Charpia stated:

I think in general it would be difficult for her to be in here with all these adults. I mean, I'm an adult and this is intimidating to me. But I think in particular she would be facing her uncle, a family member, and grandparents, and they have not believed her statement. I think she will shut down and not talk at all. I think she would be overwhelmed and intimidated and probably unable to talk with anybody.

When asked whether it would further traumatize the child to testify in front of Bray, Charpia responded:

I think it would not be empowering. I think it would be further depressing because I think she would—the fear and intimidation of this place, I think you wouldn't get any statement from her, and I think it would further depress the whole situation.... I think it would be empowering if she could talk to a judge and jury and the lawyers, of course, about what happened, but if she was to face the family members and they were—I mean, this is her uncle and grandmother and other extending [sic] family that they really have not seen to any degree since this happened—I think she would not talk about this.

The child's mother testified that "because of [the child's] age and her mental ability to understand what's going on, I just don't think that it would be appropriate for her to come in here and face a lot of people that she doesn't know who they are." The mother also stated that if the child were in the same room with Bray "she might feel intimidated by him." When asked what her basis was for feeling the child would be intimidated by Bray, the mother replied, "Because I'm her mother and I think I know what's best."

In ruling the child would be permitted to testify outside Bray's presence, the trial court announced:

I think this is probably a classic case of why that last part of 16-3-1530, I think, was passed. We've got a young child who it's alleged has been molested at the age of five and who is seven years of age now. We've got testimony from

the mother and the expert which shows that except for the mother, at least as far as I know it right now, the rest of the family don't believe her. And so I think that's classic. That would—to me would be a classic situation as to why it would be passed.

Significantly, the trial judge did not personally interview the child about the possibility of testifying in front of Bray despite the supreme court's suggestion to do so in this type of case. *Murrell,* 302 S.C. at 81 n. 2, 393 S.E.2d at 921 n. 2.

In *Murrell,* the trial judge did not interview the child, but did take testimony from the child's mother, aunt, and an expert, all of whom testified about the child's behavior since the incident. Further, the expert testified "specifically about the traumatic impact an in-court confrontation would have on the child." *Id.* at 79, 393 S.E.2d at 920. The court then ruled: "Dr. Harding testified that in his opinion there would be significant harm to the child if he were required to testify in the presence of the Defendant. I believe the testimony of Dr. Harding concerning potential harm to the child." *Id.* The trial court's ruling was upheld on appeal.

In *State v. Cooper,* 291 S.C. 351, 353 S.E.2d 451 (1987), upon which the *Murrell* court relied, the trial judge interviewed the three-year-old sexual abuse victim and the child's mother in chambers. Both the child and her mother testified the child was afraid of the defendant. The trial court's ruling to allow videotaped testimony was upheld on appeal.

A slightly different procedure was used in *State v. Lopez,* 306 S.C. 362, 412 S.E.2d 390 (1991), which was affirmed on appeal. *Lopez* was not a sexual abuse case, but rather a murder trial in which the defendant was accused of murdering her three-year-old stepson. At issue was the testimony of the defendant's other two stepsons. The stepsons testified in the courtroom, but the defendant was required to sit out of their line of sight. In making its decision, the trial judge relied upon testimony from both stepsons, a detailed letter from a psychologist who had interviewed both children, and the solicitor's testimony regarding a second expert's opinion. The supreme court approved the judge's case-specific finding of necessity and the method employed, noting, "In *State v. Murrell* [ ], we suggested expert testimony should be utilized

when possible and the trial judge should also personally interview the child." *Id.* at 365–66, 412 S.E.2d at 392.

In *Starnes v. State,* 307 S.C. 247, 414 S.E.2d 582 (1992), the supreme court affirmed the defendant's conviction for first degree criminal sexual conduct. At the pre-trial hearing to determine the necessity of videotaped testimony, the child victim stated he was afraid of his parents and did not want to testify in front of them. The child's fear was confirmed by expert testimony from the child's psychiatrist. The supreme court held that the defendant-mother's Sixth Amendment right to confront her accusers was not prejudiced by her absence from the pre-trial hearing when her attorney was present and cross-examined the child and the expert.

Recently, this court held that a trial judge's reliance solely on the testimony of an expert was sufficient evident to support the necessity for videotaped testimony. *In re Cisco K.,* 332 S.C. 649, 506 S.E.2d 536 (Ct.App.1998). However, the expert there had seen the four-year-old victim eighteen times and was able to testify specifically about the child's nightmares, fear of being killed, and high anxiety level both in and out of the treatment sessions. Further, the expert testified the child said "she never wanted to see Cisco again, wanted to beat him up, and would like to see him in jail." *Id.* at 652, 506 S.E.2d at 538.

Of these cases, only in *Murrell* and *Cisco K.* did the trial judge not interview the child. However, the testimony in both those cases was much more extensive and specific than that relied upon here, and involved the children's strong fear of the respective defendants. Further, those cases involved specific findings by the trial judges regarding their reasons for ordering the videotaped testimony.

By contrast, the expert testimony here came from a social worker who provides family counseling, rather than an expert trained specifically in child sexual abuse. She saw the child only eight times, the final session being July 22, 1996. The trial took place November 4–8, 1996. Charpia testified that the child presented symptoms of depression, but also stated the child "continues to blame herself because of the family estrangement." She testified generally about the child's intimidation of the courtroom setting, but pointed to nothing

specific about the child's fear of the defendant. In fact, she stated that the child loves the defendant, has referred to him as her best friend, and was "afraid that she was in trouble and she was going to get Uncle Gary in trouble by talking about this." Finally, Charpia said, "[The child] feels like a lot of victims feel. She inappropriately feels responsible for a lot of the adult behavior that happened.... All I can say is that [this child], as any child would feel, feels intimidated by court in general ... and facing her accusers, which are her family."

The mother's testimony was, at best, also quite generalized. While stating the child has had nightmares since the alleged abuse, she admitted the child also had nightmares prior to the alleged abuse. The only other behaviors the mother was able to point to that she felt were a result of abuse were that the child "has a tendency like she wants to talk back or she doesn't want to do what you ask her to do at times." Significantly, the mother also conceded that the child loved Bray and considered him her best friend.

■ "It is clear from our case law that a trial judge's first-hand observations and impressions of a child, whether through testimony, interviewing, or otherwise, are not only required when possible, but carry great weight in the evidentiary sufficiency question." *Lewis*, 324 S.C. at 550, 478 S.E.2d at 867. In *Lewis*, this court acknowledged that, in making a case-specific finding of the necessity for videotaped testimony, the " 'trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than mere nervousness or excitement or some reluctance to testify.' " *Id.* at 545, 478 S.E.2d at 864 (quoting *Maryland v. Craig*, 497 U.S. 836, 856–57, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (citations omitted)).

■ We do not think this burden has been met in this case. We realize that while *Murrell* 's suggestion that the trial judge interview the child is not mandatory, it was strongly suggested as appropriate in all such cases.[3] Given the threshold ac-

---

3. A videotape of the child's testimony is part of the record on appeal. After viewing this tape, we note that the child appeared quite relaxed, forthright, and credible. Had the trial judge interviewed her prior to his decision to let her testify via CCTV, he may have found her competent to testify in Bray's presence.

knowledged in *Lewis,* we hold that only when the considered testimony is strong, specific, and persuasive about the child's fear of the defendant and the harm the child will suffer if forced to testify in front of the accused may the trial judge forego interviewing the child directly.[4]

Here, the expert and the mother both testified in a generalized manner. Charpia was not an expert in child sexual abuse, and her sessions with the child had ended well before trial. Rather than showing that the child was intimidated by or afraid of Bray, the testimony here showed that the child was afraid of the consequences Bray would suffer from her testimony. There was simply no showing of trauma to the child that was not common to most intra-family child abuse cases. Consequently, we hold that there was insufficient evidence of the necessity of having this child testify via CCTV.

 We note that violation of a defendant's Sixth Amendment right to confrontation is not necessarily reversible error unless the defendant suffered prejudice therefrom. *Lewis,* 324 S.C. at 550, 478 S.E.2d at 867; *State v. Graham,* 314 S.C. 383, 386, 444 S.E.2d 525, 527 (1994).

"Whether such an error is harmless in a particular case depends upon a host of factors. . . . The factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

Here, the child's testimony provided the only direct evidence of Bray's alleged abuse. A medical examination of the child did not validate the sexual abuse claim, and it was not until her interview with LCC's therapist that the child mentioned Bray or sexual acts. We note this was after an opportunity to tell her grandmother and her parents and after

---

4. We note that Bray was not present in the courtroom during the *in camera* hearing, and there is no reason apparent from the record that the child was not interviewed. She was present at the courthouse on the day of the hearing.

an initial psychological evaluation-in other words, after several events had already transpired in the investigation into the alleged abuse without the child ever mentioning Bray's participation. Bray testified in his own defense and directly denied the allegations. Under these circumstances, we find Bray's constitutional right to confront his accuser was of paramount importance, and its denial cannot be deemed harmless error.

Accordingly, we reverse Bray's conviction and remand for a new trial.[5]

**REVERSED AND REMANDED.**

HUFF and STILWELL, JJ., concur.

---

5. Because of our disposition on this issue, we need not reach Bray's remaining exceptions raised in this appeal.