[No. B178548. Second Dist., Div. Two. July 27, 2005.]

In re APRIL C. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
HUGO M. et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.B, I.C and II of the Discussion.

## COUNSEL

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant Hugo M.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant Rosa P.

Raymond G. Fortner, Jr., County Counsel, Larry Cory, Assistant County Counsel, and Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

OPINION

**DOI TODD, J.**—Hugo M. (Hugo), the boyfriend of Rosa P. (Mother), mother of minors Ashley and April, appeals orders declaring the minors to be dependents of the juvenile court and denying him reunification services. Hugo contends the juvenile court erred in admitting the hearsay statements of April accusing him of sexually molesting her. He asserts that pursuant to the United States Supreme Court opinion in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], the admission of April's testimony deprived him of his due process right to confrontation, and without the hearsay statements, the evidence was insufficient to support a finding that he sexually molested April. Hugo also challenges the denial of reunification services with regard to Ashley, who is his biological child. He contends that the juvenile court erroneously determined that he was an alleged father, rather than a presumed father, and therefore erred in denying him reunification services. Mother separately appeals, contending that substantial evidence did not support the juvenile court's jurisdictional findings based on her conduct.

We affirm. The United States Supreme Court decision in *Crawford* has no application here because the Sixth Amendment right of a criminal defendant to confrontation under the United States Constitution does not extend to parents in state dependency proceedings.

In an unpublished part of this opinion, we find that the court did not err in denying Hugo reunification services, as there was no evidence that Hugo sought to take Ashley into his home or was prevented from satisfying the requirements for presumed father status. As an alleged father, Hugo was not entitled to reunification services. We also find that as to Mother's claim, substantial evidence supports the juvenile court's jurisdictional findings based on Hugo's sexual abuse of April and Mother's failure to protect the children.

## FACTUAL AND PROCEDURAL BACKGROUND

Rosa P. is the mother of April, born in April 2000, and Ashley, born in March 2004. Hugo is Ashley's father, and Enrique C. is April's father. The children came to the attention of the juvenile court on July 2, 2004, when the Los Angeles County Department of Children and Family Services (the Department) filed a petition under Welfare and Institutions Code section 300[1] on their behalf based on allegations that Hugo sexually abused April.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

*April's disclosures of sexual abuse and the detention proceedings.*

During a bath at her paternal grandmother's (Grandmother) house, April complained that Hugo had caused her vaginal area to hurt by touching her there. Grandmother checked the child's underwear and noticed stains that resembled dried blood. April told Grandmother that she had told her mother that Hugo had touched her, but her mother had said nothing. Grandmother and Enrique took April to the hospital where she underwent a genitourinary examination. Based on the medical examination and information provided by Grandmother, the physician's clinical impression was suspected sexual abuse with no penetration.

In an interview conducted in Spanish at the hospital, April told a police officer, "it happens when I'm at my mom's home . . . Hugo . . . made it hurt down there [vaginal area] . . . he would rub his hand on me over my clothes, down there [vaginal area] when I go to bed at night." The following day the social worker attempted to interview April, but April appeared to be afraid of the social worker, refusing to say anything or interact with him, even with relatives present in the room.

April was detained, but Mother and Ashley could not be found. Hugo was later arrested on an outstanding warrant for drug possession.

The petition filed by the Department under section 300, subdivisions (b) (failure to protect), (d) (sexual abuse), (i) (cruelty), and (j) (abuse of sibling) alleged that on a prior occasion Hugo sexually abused April by fondling her vagina with his hand, causing bleeding, redness, and irritation; Mother knew or reasonably should have known of the sexual abuse and failed to protect; and Ashley was at risk of suffering the same abuse. Neither Mother nor Hugo appeared at the initial detention hearing on July 2, 2004, and the matter was continued to July 8, 2004. Ashley was ordered detained and April was released to Enrique.

On July 7, 2004, April underwent a sexual abuse medical examination which resulted in a preliminary finding of a healing anal tear. In a forensic interview conducted the same day, April stated that Hugo hit her on the head with his hand, but she did not report any sexual abuse. Nevertheless, based on April's excited behavior in response to questions about Hugo and the doctor's visit, the interviewer recommended that April be referred for evaluation and treatment for possible sexual abuse.

At the July 8, 2004 detention hearing, the juvenile court found Enrique to be April's presumed father under Family Code section 7611. Mother informed the court that Hugo was Ashley's biological father, but the court found him to be only an alleged father because, despite regularly visiting her and holding himself out as her father, he never received her into his home. Ashley continued to be detained in shelter care. The court ordered monitored visits for Hugo with Ashley, but no contact between Hugo and April.

Ashley underwent an anal-genital exam on July 13, 2004, the results of which were normal, neither confirming nor negating sexual abuse.

On July 14, 2004, a female social worker interviewed April in Spanish. Pointing to her vaginal area, the child reported that Hugo had touched her there when she was in the bathroom, and that it hurt when he touched her. April said that Mother was home at the time, but she was with the baby. April told the social worker that no one else had touched her there, and that she had told her mother that Hugo had touched her.

On July 20, 2004, Ashley was released to Mother.

*The first amended petition.*

On July 28, 2004, the Department filed a first amended petition under section 300, subdivisions (b), (d), (i), and (j), realleging sexual abuse of April by Hugo, and adding new allegations that Hugo had an extensive history of substance abuse and continued using cocaine and marijuana, which rendered him incapable of providing regular care. In its July 28, 2004 jurisdiction/disposition report, the Department described Hugo's drug use and criminal record, and reported that in 1998 Hugo had been required to register as a sex offender for acts he committed as a juvenile in 1996.

*Statements by Mother, Enrique and Hugo.*

The Department reported that Mother had been cooperative and appeared to be honest. By July 15, 2004, she had enrolled in a parenting class. She denied any knowledge of the alleged sexual abuse or Hugo's prior conviction for lewd and lascivious acts with a minor under the age of 14 or his registration as a sex offender. She did not believe that Hugo had sexually abused her daughter because April never told her that Hugo had touched her.

In addition, Mother claimed that shortly before April went to stay with Grandmother and Enrique, April had been diagnosed with a urinary tract infection during a routine medical checkup. The doctor attributed the infection to poor personal hygiene, which he said was not unusual for a child April's age. Because April was with Enrique when she made the initial disclosure of sexual abuse, and Enrique had previously threatened to " 'do what he needed to do to take [April]' " away from Mother, Mother indicated that she was not sure what really happened to her daughter. Mother told the social worker she intended to continue her relationship with Hugo and that she still planned to marry him.

Enrique reported that although April had not previously disclosed abuse, he had observed changes in April's behavior months earlier, such as regression, increased crying and a reluctance to visit with him. He had disliked Hugo since learning that Hugo yelled at April and tried to hit her.

Hugo appeared bewildered by the accusations and suggested Enrique and Grandmother had told April to make up the story out of dislike for him. He stated that he cares deeply for April, and worries about her. While admitting he scolded her, he denied having sexually abused her.

With regard to his sex offender registration, Hugo admitted he had pled guilty to sexually and physically abusing a child under the age of two, but insisted that he did not commit the crime and did not know what he was doing when he entered his plea. He was deported after serving two and one-half years of a 10-year prison sentence and subsequently returned to the United States. He claimed that while he was in custody he completed an 18-month sex offender program.

Hugo also admitted continued marijuana and cocaine use, and that he had a cocaine addiction before his arrest in 1998 on the sexual abuse case. He reported that he dropped out of school before completing the seventh grade because of his involvement with gangs and drugs.

According to Hugo, his relationship with Mother was not very good and he was only interested in Ashley. But at the same time, he stated he was considering marrying Mother. He maintained that he had disclosed his prior sex crime to Mother, and she "accepted him as he was."

It was unclear to the social worker whether Mother and Hugo lived together; Mother consistently denied ever living with Hugo, but Hugo told the police that they lived together, and this was confirmed by Mother's landlord. Hugo later denied living with Mother, and said he did not know why he had told the police otherwise.

*The jurisdictional hearing.*

At the jurisdictional hearing on October 5, 2004, the Department filed a second amended petition, adding the allegation that Hugo had a previous conviction for lewd and lascivious acts with a minor under the age of two and was a registered sex offender. The court received all the Department reports and the parties stipulated that April was not competent to testify.[2] The court denied Hugo and Mother's motion to strike all of April's hearsay statements in the Department's reports.

*Mother's testimony.*

Mother testified that she and Hugo never lived together, and that Hugo never spent the night in her home, nor she in his, even before Ashley was born. She testified that Hugo visited frequently, and admitted that her landlord often saw Hugo during these visits. After Ashley was born, Hugo visited every weekend.

Mother claimed that Hugo always acted appropriately with April, and never appeared to be sexually interested in her. She insisted she never left Hugo alone with either child except when she went to the bathroom. She claimed Hugo never bathed the children or changed their diapers, and that he never took April to the bathroom. In short, according to Mother, Hugo never had an opportunity to sexually abuse April or Ashley. Mother testified she had no reason to suspect sexual abuse because April never said anything about Hugo touching her and everything appeared to be normal. But Mother failed to respond to the court's direct questions about why she never trusted Hugo to leave her daughters, even his own child, in his care.

Mother also claimed that prior to these court proceedings, she knew nothing of Hugo's drug use or his prior conviction and registration as a sex

---

[2] Counsel for Hugo stipulated only after April failed to qualify as a competent witness.

offender. Finally, Mother testified that when she learned of the sexual abuse allegations, she promptly sought a restraining order against Hugo, and abandoned her plans to marry him.

*Grandmother's testimony.*

Enrique lived with Grandmother, and April visited them almost every weekend. During these visits, Enrique did not care for April, and only Grandmother would bathe, change or take the child to the bathroom. Grandmother testified about April's disclosure of sexual abuse. She also testified that April had begun to exhibit strange behavior, which she described as kissing Grandmother's feet and up and down her legs with her mouth slightly open. Grandmother did not remember whether this kissing behavior occurred before or after April's abuse disclosure. According to Grandmother, Mother did not believe Hugo had sexually abused April when Grandmother informed her of April's disclosure.

Grandmother did not know whether Mother and Hugo lived together, but whenever she went to Mother's home to get April for the visits, Hugo was there, whatever the time. April also told Grandmother that Hugo lived with them.

*Hugo's testimony.*

Hugo denied ever living with Mother, spending the night with her, or having Mother spend the night at his home. He visited every weekend and once a week during the week. On weekends, April was there only about half the time. Hugo stated he had a good relationship with April; they had fun together and she was not afraid of him. Hugo testified that Mother never left him alone with either of the children. He never bathed the children, changed their diapers or helped April in the bathroom. He also testified that while he remembered being alone with Ashley a few times, he was never alone with April.

Hugo testified that he and Mother were no longer romantically involved and had no plans to marry. Indeed, after his arrest three months earlier, Hugo had not seen Mother at all except in court.

Hugo confirmed that he had been convicted of a sexual molestation charge, but claimed he did not understand what he was doing when he pled guilty. He denied ever sexually molesting April or the victim of his juvenile conviction. He also denied ever telling Mother about the prior conviction.

Hugo admitted his marijuana and cocaine use as described in the Department's July 28, 2004 report, and that he last used drugs on June 29, 2004. Following this testimony, Hugo's attorney cut off further examination, stating, "Your honor, [Hugo] is not denying the drug allegation."

*The juvenile court's findings and orders.*

The court found April's statements to be reliable, because the statements to Grandmother, the social worker and the police detective were all consistent. The court further found that evidence of the healing anal tear corroborated April's statement, but rejected evidence of the urinary tract infection and staining in the underwear as corroboration.

At the conclusion of the hearing, the court amended the petition to conform to proof, adding the allegations that Hugo had a previous conviction under Penal Code section 288, subdivision (a), and that Mother did not believe the allegations of sexual abuse and intended to maintain the relationship with Hugo after the disclosure. The court also found that although Hugo did not reside in the household, he was still a member of the household due to his substantial contacts with the children. The court then dismissed the allegation pursuant to section 300, subdivision (i), and sustained the petition as amended.

At the disposition hearing the following day, the court ordered April to remain released to Enrique, and placed Ashley in foster care. The Department was ordered to provide reunification services to Mother. The court again found that Hugo was an alleged father, and denied reunification services to him under section 361.5, subdivisions (a) and (b)(12), further finding that Ashley would not benefit from services to Hugo given his history of sexually abusing very young children.

Hugo and Mother filed timely notices of appeal.

## DISCUSSION

I. *Hugo's Appeal of the Juvenile Court's Jurisdiction and Disposition Orders.*

A. *Sufficiency of the Evidence.*

1. *The Child Dependency Exception and Section 355.*

■ The difficulties of proving child sexual abuse in juvenile dependency cases led our Supreme Court in *In re Cindy L.* (1997) 17 Cal.4th 15 [69

Cal.Rptr.2d 803, 947 P.2d 1340] (*Cindy L.*) to establish the child dependency hearsay exception for a child victim's out-of-court statements in dependency hearings. Under this exception, child hearsay statements in dependency proceedings in which sexual abuse is alleged are admissible if (1) the court finds that the time, content and circumstances of the statements provide sufficient indicia of reliability; (2) the child is available for cross-examination or there is evidence of child sexual abuse that corroborates the child's statements; and (3) interested parties have adequate notice that the statements will be used. (*Id.* at p. 29.) The court adopted factors set forth in *Idaho v. Wright* (1990) 497 U.S. 805, 821–822 [111 L.Ed.2d 638, 110 S.Ct. 3139], as indicia of reliability of such hearsay statements: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate." (*Cindy L., supra,* 17 Cal.4th at p. 30.)

■ Following the Supreme Court's articulation of the child dependency exception in *Cindy L.*, section 355[3] was amended to expressly authorize the admission of hearsay statements of a child victim contained in a social study. Subsequent to the enactment of section 355, our Supreme Court again considered the issue of the child dependency exception in *In re Lucero L.* (2000) 22 Cal.4th 1227 [96 Cal.Rptr.2d 56, 998 P.2d 1019] (*Lucero L.*). Noting that pursuant to section 355, subdivision (b), a hearsay statement in a social study[4] was admissible even if it did not meet the requirements of the

---

[3] Section 355 provides in pertinent part: "(a) At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. . . . [¶] (b) A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d). . . . [¶] . . . [¶] (c)(1) If any party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions: [¶] (A) The hearsay evidence would be admissible in any civil or criminal proceeding under any statutory or decisional exception to the prohibition against hearsay. [¶] (B) The hearsay declarant is a minor under the age of 12 years who is the subject of the jurisdictional hearing. However, the hearsay statement of a minor under the age of 12 years shall not be admissible if the objecting party establishes that the statement is unreliable because it was the product of fraud, deceit, or undue influence. [¶] (C) The hearsay declarant is a peace officer . . . , a health practitioner . . . , a social worker . . . , or a teacher . . . ."

[4] The Court defined social studies to include social worker's reports as well as other additional information reports furnished to the juvenile court in matters involving the custody, status or welfare of a minor in a dependency proceeding. (*Lucero L., supra,* 22 Cal.4th at p. 1233, fn. 2.)

child dependency exception and even if the minor were incompetent to testify, unless such a statement was the product of fraud, deceit, or undue influence (*Lucero L., supra,* at pp. 1242–1243), the court recognized that due process required a finding by the court that " 'the statement bears special indicia of reliability.' " (*Id.* at p. 1246.)[5]

## 2. *Crawford Does Not Apply to Dependency Proceedings.*

Hugo argues that principles enunciated in *Crawford v. Washington, supra,* 541 U.S. 36 (*Crawford*),[6] involving a criminal defendant's right to confrontation under the Sixth Amendment, alter the due process analysis of the admissibility of child victim hearsay statements in dependency proceedings. He contends that in light of *Crawford*, application of the " 'reliability test' to justify the admission of testimonial hearsay at dependency adjudications when the child is unavailable to testify violates the due process guarantees of confrontation afforded to parents in state dependency proceedings under the 14th [*sic*] Amendment." Hugo asserts that the indicia of reliability developed in *Cindy L.* and *Lucero L.*, which were drawn from the United States Supreme Court's list of factors relevant to the reliability of hearsay statements made by child witnesses in sexual abuse cases, is no longer valid under

---

[5] The Supreme Court noted that corroboration, the additional requirement of the child dependency hearsay exception articulated in *Cindy L.*, "is not mandated by due process," and "because section 355 specifically authorizes the admittance of and reliance on the hearsay statements of minors who are the subject of dependency proceedings without reference to corroboration, we conclude that corroboration is not necessary in this context." (*Lucero L., supra,* 22 Cal.4th at pp. 1248, 1249.)

[6] *Crawford* overruled *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531] (*Roberts*). *Roberts* "says that an unavailable witness's out-of-court statement may be admitted [without violating the Sixth Amendment's confrontation clause] so long as it has adequate indicia of reliability—*i.e.*, falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.' " (*Crawford, supra,* 541 U.S. at p. 42.) In rejecting the *Roberts* reliability test, the high court stated: "Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." (*Crawford, supra,* at p. 61.) "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Id.* at p. 68, fn. omitted.)

*Crawford.* (See *Cindy L., supra,* 17 Cal.4th at p. 30; *Lucero L., supra,* 22 Cal.4th at p. 1249.) Hugo argues that the United States Supreme Court has now squarely rejected the reliability test upon which the child dependency exception was based, when it held that the test is so "malleable" and "unpredictable" that it fails to provide meaningful protection from even core confrontation violations. (*Crawford, supra,* 541 U.S. at p. 63.)

■ We conclude that *Crawford* does not apply in juvenile dependency proceedings and does not afford a basis to discredit the analysis in *Cindy L.* or *Lucero L.* Our Supreme Court has unequivocally held that parents involved in dependency proceedings and criminal defendants are not similarly situated for purposes of the equal protection clause under the Fourteenth Amendment to the United States Constitution (*In re Sade C.* (1996) 13 Cal.4th 952, 991 [55 Cal.Rptr.2d 771, 920 P.2d 716]), and that the Sixth Amendment right to confrontation does not apply to parties in civil proceedings, including juvenile dependency proceedings. (*In re Malinda S.* (1990) 51 Cal.3d 368, 383, fn. 16, 384 [272 Cal.Rptr. 787, 795 P.2d 1244].) These distinctions stem from the fundamentally different purposes of criminal as opposed to juvenile dependency proceedings. Noting the practical difference between the application of constitutional principles in criminal cases versus those appropriate for dependency cases, *In re Carmen O.* (1994) 28 Cal.App.4th 908 [33 Cal.Rptr.2d 848], observed that "[i]n a criminal case the issue is the guilt of the defendant, whereas in a dependency case the subject is the well-being of the victim. . . . [W]hile it may be true that ' "it is better that ten guilty persons escape, than that one innocent suffer" . . . few, if any, would agree it is better that 10 pedophiles be permitted to continue molesting children than that 1 innocent parent be required to attend therapy sessions in order to discover why his infant daughter was falsely making such appalling accusations against him.' " (*Id.* at p. 922, fn. 7, quoting *In re Kailee B.* (1993) 18 Cal.App.4th 719, 727 [22 Cal.Rptr.2d 485] (*Kailee B.*).)

■ Indeed, courts have rejected constitutional challenges to the admission of child victim hearsay statements in dependency cases similar to Hugo's claim here, noting "that '[d]ependency proceedings are civil in nature, designed not to prosecute a parent, *but to protect the child.*' In these proceedings, 'the paramount concern is the child's welfare.' (*In re Malinda S., supra,* 51 Cal.3d at p. 384, italics added.) We further note that '[a]s a matter of constitutional principle, the United States Supreme Court has held that a state's compelling interest in protecting child victims of sex crimes from further trauma may in some instances outweigh the right of confrontation. (*Maryland* v. *Craig* (1990) 497 U.S. 836, 852 [111 L.Ed.2d

666, 110 S.Ct. 3157] [upholding procedure of closed-circuit television testimony by child in criminal case].)' [Citation.]" (*In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1044 [17 Cal.Rptr.2d 643]; see *Kailee B., supra,* 18 Cal.App.4th at pp. 725–726.)

As we recognized in *Kailee B.*, a young child may not qualify to testify as a witness for any number of reasons, including the overwhelming intimidation of a courtroom setting. Still, a less intimidating setting could permit the child to communicate readily and with ease, and the child could indeed be capable of observing and reporting specific events the child experienced or observed. (*Kailee B., supra,* 18 Cal.App.4th at p. 725.)

■ We are satisfied that evidence admitted pursuant to section 355, subjected to the judicial test of reliability, as set forth in *Lucero L., supra,* 22 Cal.4th at p. 1246, continues to protect the due process rights of a parent accused of sexual abuse in a dependency proceeding. For these reasons, we conclude that the requirement of fundamental fairness in the due process clause of the Fourteenth Amendment does not compel the striking of April's statements from the reports.[7] We further conclude that April's statements, together with the corroborating evidence of sexual abuse, constitute substantial evidence in support of the juvenile court's jurisdictional findings and disposition order.

B.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Mother's Appeal of the Jurisdictional Findings.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7] Having concluded that the admission of April's hearsay statements did not violate Hugo's constitutional due process rights, and that *Crawford* is inapplicable here, we need not address the issue of whether April's statements were testimonial or nontestimonial within the meaning of *Crawford.*

*See footnote, *ante,* page 599.

## DISPOSITION

The juvenile court's jurisdiction/disposition orders are affirmed.

Boren, P. J., and Suzukawa, J.,[*] concurred.

Appellants' petition for review by the Supreme Court was denied October 12, 2005.

---

[*]Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.