In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00090-CR

                                                ______________________________

 

 

                                KEITH ASHLEY HUBBARD,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                         On Appeal from the 5th Judicial District Court

                                                             Bowie County, Texas

                                                       Trial Court
No. 08F0792-005

 

                                                      
                                            

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                            Memorandum Opinion by Justice Moseley








                                                     MEMORANDUM 
OPINION

 

            A
Bowie County jury found Keith Ashley Hubbard guilty of seven counts[1]
of aggravated sexual assault of Tabitha Fowl,[2] a
child.  Hubbard was sentenced to fifty
years’ imprisonment for each of the seven counts, the sentences to run
consecutively.  During the trial on the
merits, the trial court prohibited Hubbard from cross-examining several
witnesses about whether the child had made accusations against others of sexual
assault. 

            On
appeal, Hubbard contends that the exclusion of evidence that the child had
lodged accusations against four other people (including two members of Hubbard’s
household) of having sexually assaulted her was harmful error. 

            We
affirm the judgment. 

Facts

            In
June 2007, then five-year-old Tabitha resided in the same residence with
Hubbard. Also living in the residence were Buffy Hubbard (Hubbard’s wife and
the aunt of Tabitha) and Buffy’s three sons. 


            Bobby
Mixon, a Wake Village police officer, was called to the Hubbard residence to
investigate allegations of sexual assault on Tabitha.  Hubbard was prohibited from establishing by
the testimony of Mixon that the allegation was not that Hubbard had committed
an assault but, rather, that one of Buffy’s juvenile sons had done so.  

            Karrah
Dickeson interviewed Tabitha at the Children’s Advocacy Center in Texarkana,
Texas.  During that interview (and again
at trial), the child described the different ways that Hubbard sexually
assaulted her.  Tabitha testified that “white
stuff” came out of Hubbard’s “wrong spot.”  However, Dickeson testified that Tabitha also
twice denied that “white stuff” came out of Hubbard’s “private.”  During the interview, but not at trial,
Tabitha identified one of Buffy’s sons as the source of the “white stuff.”[3]  

            On
voir dire outside the presence of the jury, or upon in camera examination,
Mixon, Buffy, and Dickeson testified that the child had also made outcries of
sexual assault against Buffy’s two juvenile sons.  Specifically, Hubbard sought to rebut Tabitha’s
trial testimony that the “white stuff” came from Hubbard by introducing
testimony that during her interview, Tabitha had identified one of Buffy’s sons
as the source of the “white stuff.” 

            April
Graves (who identified herself as Tabitha’s adoptive mother) testified, in
camera, that Tabitha “has mentioned all three in different sexual acts against
her,” referencing two of Buffy’s sons by name and Hubbard by inference.  In accord with Rule 412 of the Texas Rules of
Evidence, Hubbard made clear his intention to question several witnesses
(including Mixon, Dickeson, and Graves) regarding accusations of sexual assault
made by Tabitha against other persons, including Buffy’s two juvenile sons;
Hubbard also wanted to bring out that Tabitha had identified someone other than
Hubbard as the source of the “white stuff.”  After proper in camera hearings as well as
hearings and offers of proof outside the presence of the jury, the trial court
ruled that such evidence was inadmissible under Rules 403 and 412 of the Texas
Rules of Evidence. 

Standard of Review

            We
review a trial court’s decision to admit or exclude evidence for abuse of discretion.
 Mozon
v. State, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999); Sherman v. State, 20 S.W.3d 96, 100
(Tex. App.—Texarkana 2000, no pet.).  Such
an inquiry necessarily depends on the facts of each case.  Sherman,
20 S.W.3d at 100.  While an appellate
court may decide it would have ruled differently from the trial court on a
particular evidentiary issue, such disagreement does not inherently demonstrate
an abuse of discretion.  Manning v. State, 114 S.W.3d 922, 926
(Tex. Crim. App. 2003).  Instead, the
appellate court may only find an abuse of discretion when the trial court’s
decision “is so clearly wrong as to fall outside the zone of reasonable
disagreement or when the trial court acts arbitrarily and unreasonably, without
reference to any guiding rules or principles.”  Reynolds
v. State, 227 S.W.3d 355, 371 (Tex. App.—Texarkana 2007, no pet.).

Analysis

            The
trial court prohibited several attempts by Hubbard to offer general evidence
the child had accused four other people of sexually assaulting her and, more
specifically, that the child previously identified someone other than Hubbard
as the source of the “white stuff.”  Hubbard
argues that the exclusion of this evidence violated his rights to confrontation
by limiting his ability to cross-examine the witnesses against him, and was
improper because the probative value of the evidence outweighed any potential
prejudicial effect it may have created. 

            Rule 403

            As
part of his second point of error, Hubbard argues that the trial court erred in
excluding the evidence because the probative value of the evidence outweighed
the danger of unfair prejudice. 

            Generally,
our rules favor admission of all relevant evidence, and we presume relevant
evidence to be more probative than prejudicial.  See,
e.g., Tex. R. Evid. 402; Fletcher v. State, 852 S.W.2d 271, 277
(Tex. App.––Dallas 1993, pet. ref’d).  Most
relevant evidence offered by one party will be prejudicial to the opposing
party.  Id.  The trial court can
exclude relevant evidence if its unfair prejudice substantially outweighs its
probative value.  Tex. R. Evid. 403; Montgomery
v. State, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh’g); Fletcher, 852 S.W.2d at 277.  “‘Unfair prejudice’ . . .  refers to an ‘undue tendency to suggest
decision on an improper basis, commonly, though not necessarily, an emotional
one.’”  Cohn v. State, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993).  Under Rule 403, the trial court may also
exclude relevant evidence that would confuse the issues, mislead the jury,
cause undue delay, or needlessly present cumulative evidence.

            In
determining whether the potential prejudice of evidence outweighs its probative
value, we consider:  (1) how compellingly
the evidence makes a consequential fact more or less probable, (2) the evidence’s
potential to impress the jury in an irrational way, (3) the time needed to
develop the evidence, and (4) whether other evidence is available to prove the
consequential fact at issue.  Mozon, 991 S.W.2d at 847. 

            The
first factor mentioned in Mozon (how
compelling the evidence makes a consequential fact more or less likely) and the
fourth factor (whether other evidence is available to prove the consequential
fact at issue) weigh heavily in favor of excluding the evidence.  “There is no purely legal test to determine
whether evidence will tend to prove or disprove a proposition—it is a test of
logic and common sense.”  Miller v. State, 36 S.W.3d 503, 507
(Tex. Crim. App. 2001).  The key here is
the “consequential fact” element of both factors.  Accusations against third parties, even other
members of Tabitha’s family or household, of different and separate sexual
assaults are inconsequential and not probative of the accusations against
Hubbard.  That the child testified that
she saw “white stuff” come out of one of Buffy’s sons is likewise not probative
of whether she saw “white stuff” come from Hubbard and there is no evidence
that the two instances are the same event. 


            The
second factor (the potential of the evidence to impress the jury in an
irrational way) weighs in favor of exclusion.  All evidence prejudices one party or the
other.  However, evidence that the child
has accused others of separate sexual assaults is, at best, of questionable
relevance to the question of whether Hubbard assaulted the child and it could
easily have the effect of confusing or misleading the jury.    

            Very
little time would be needed to develop the evidence; therefore, the third factor
weighs in favor of admission.

            In
support of his appeal, Hubbard relies primarily on the case of Kesterson v. State, where the defendant
was accused of sexually assaulting his five-year-old stepdaughter.  997 S.W.2d 290, 292 (Tex. App.––Dallas 1999, no
pet.).  During the child’s interview with
the State’s psychologist, she accused a different male relative of the very
assault with which the defendant was charged, but, at trial, the child
testified that the other relative never touched her.  The other male relative had access to the
child and disappeared before trial.  The
defendant sought to introduce the child’s statement through cross-examination
of the psychologist.[4]
 The State argued that Rule 412 excluded
any references to any other sexual abuse and the trial court excluded the
evidence, relying on both Rule 412 and Rule 403.

            In
Kesterson, the court of appeals held
that the evidence was admissible under Rule 403, noting that the child’s
testimony of the events varied depending on who was questioning her, that the
child had a low IQ and suffered from attention deficit disorder, that several
witnesses testified to the child’s reputation for telling false stories, and
that the defendant’s defensive theory directly related to the excluded
evidence.  Id. at 294–95.  The court
also held the evidence admissible under Rule 412, finding that the evidence was
probative of the defendant’s theory and that “no rational jury would conclude a
five year old child was promiscuous or consented, in any way, to sexual assault.”[5]
 Id.
at 295.  Finding the erroneous exclusion
harmful to the defendant, the court of appeals reversed the trial court and
remanded the matter for a new trial.  Id. at 295–96.

            The
distinguishing facts of Kesterson are
absent in the present case.  In Kesterson, the child had accused two
different men of the same assault.  Here,
the child accused three different males of separate and distinct assaults on
her that occurred at different times; on appeal, Hubbard does not dispute that
other and separate offenses of a like nature were committed by others against
the child.  Therefore, we find Kesterson distinguishable.

            Introducing
the evidence of other alleged assaults risked misleading the jury or confusing
the issues.  For the foregoing reasons,
we find that the probative value of the excluded evidence was substantially
outweighed by the danger of unfair prejudice.  We overrule Hubbard’s point of error
pertaining to the applicability of Rule 403 in the exclusion of evidence.

            Rule 412 and
Confrontation Clause Issues

            Hubbard
raises the question of whether the trial court could have excluded the complainant’s
statement under the balancing test within Rule 412.[6]  Rule 412, the “rape shield law,” governs the
admissibility of a complainant’s previous sexual conduct in a sexual assault
prosecution.  Tex. R. Evid. 412; see
Wofford v. State, 903 S.W.2d 796, 798 (Tex. App.––Dallas 1995, pet. ref’d).
 It protects a complainant’s previous
sexual conduct from exposure, except in limited circumstances.  Tex. R.
Evid. 412; see Wofford, 903
S.W.2d at 798.[7]
 The rule includes an exception for
testimony “constitutionally required to be admitted.”  Tex. R.
Evid. 412(b)(2)(E).  As with the
pertinent test examined above as it relates to Rule 403, to be admitted into
evidence through one of Rule 412’s exceptions, the probative value of the
evidence must still outweigh its prejudicial effect.[8] 

            Hubbard
argues that the excluded evidence is “constitutionally required to be admitted”
under the Confrontation Clause of the United States Constitution and that the
probative value outweighs the evidence’s prejudicial effect.  Applying the same analysis we applied to the
court’s Rule 403 ruling, and observing that evidence of the child’s conduct in
other circumstances was of little relevance to the cogent question in the
trial, we likewise hold that the probative value of the evidence is outweighed
by the danger of unfair prejudice and that the trial court properly excluded it
under the balancing test of Rule 412.  One
should comprehend that Rule 412 restricts certain evidence which might
otherwise be admissible; its exception from application to evidence “that is
constitutionally required to be admitted”[9] does
nothing to trump the admissibility standards of Rule 403 because both rules are
subject to the same Constitutional constraints. 

            The
United States Constitution provides, in part, “[i]n all criminal prosecutions,
the accused shall enjoy the right . . . to be confronted with the witnesses
against him.”  U.S. Const. amend. VI.  The Fourteenth Amendment to the United States
Constitution makes the right to confrontation applicable to the states.  Pointer
v. Texas, 380 U.S. 400, 403 (1965).  The
Confrontation Clause ensures “the reliability of the evidence against a
criminal defendant by subjecting it to rigorous testing in the context of an
adversary proceeding before the trier of fact.”  See
Maryland v. Craig, 497 U.S. 836, 845 (1990).  Cross-examining an adverse party allows the
jury to assess a witness’s credibility and exposes facts which the jury may use
in its assessment.  See Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). 

            Each
Confrontation Clause issue must be weighed on a case-by-case basis, carefully
taking into account the defendant’s right to cross-examine and the risk factors
associated with admission of the evidence.  Hoyos v.
State, 951 S.W.2d 503, 510 (Tex. App.—Houston [14th Dist.] 1997), aff’d, 982 S.W.2d 419 (Tex. Crim. App. 1998).
 In speaking of the interplay of the
Texas Rules of Evidence and the United States Constitution, the Texas Court of
Criminal Appeals has recently observed:

Generally, the right to present evidence and to
cross-examine witnesses under the Sixth Amendment does not conflict with the
corresponding rights under state evidentiary rules.  Thus, most questions concerning
cross-examination may be resolved by looking to the Texas Rules of Evidence.  In those rare situations in which the
applicable rule of evidence conflicts with a federal constitutional right, Rule
101(c) requires that the Constitution of the United States controls over the
evidentiary rule.  Rule 101(c) also
states, “Where possible, inconsistency is to be removed by reasonable
construction” as well as by reasonable application of the rule.  Thus, compliance with the reasonable
construction and application of a rule of evidence will, in most instances,
avoid a constitutional question.

 

Hammer v. State, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009) (footnote
omitted).

            Even
though it does not recite such a restriction within its body, Rule 403 would be
subject to the same Constitutional considerations as Rule 412.  Our analysis of the trial court’s application
of Rules 403 and 412 reflect that it was within the trial court’s discretion to
rule that the probative value of the excluded evidence was outweighed by the
danger of unfair prejudice and that admitting the evidence presented a valid
risk of jury confusion.  While the Sixth
Amendment protects an accused’s right to cross-examine witnesses, it does not
prevent a trial judge from limiting cross-examination on concerns about, among
other things, “harassment, prejudice, confusion of the issues, the witness’
safety, or interrogation that is repetitive or only marginally relevant.”  Hammer,
296 S.W.3d at 561 & n.7 (quoting Delaware
v. Van Arsdall, 475 U.S. 673, 679 (1986)).  Therefore, the trial court did not abuse its
discretion. 

            We
affirm the judgment of the trial court.

 

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          March
19, 2010

Date Decided:             May
7, 2010

 

Do Not Publish











[1]Although
Hubbard was originally charged by indictment with nine counts of aggravated
sexual assault of a child, two of those counts were dismissed at the instance
of the State.





 

[2]Tabitha
Fowl is the pseudonym used by the trial court to protect the child’s privacy.

                





[3]The
video recorded interview is referenced outside the presence of the jury.  The recorded interview was not included in
the record on appeal, but it was entered in the trial court as a record exhibit
only. 





[4]The
defendant also sought, unsuccessfully, to have the child’s statement admitted
through direct examination of the defendant’s retained psychologist and the
child.





 

[5]The
Kesterson court also held that in the
event “rule 412 was ever intended to classify sexual assault of a five year old
child as ‘past sexual behavior of a victim,’ the facts in [the Kesterson] case meet the exception of
412(b)(2)(E).”  Kesterson, 997 S.W.2d at 295 n.4.

 





[6]Tex. R. Evid. 412(b)(3). 

 





[7]Rule
412(c) also requires an in camera proffer of evidence of prior sexual conduct
and a ruling on its admissibility before it can be introduced.  This procedure was meticulously followed by
the trial court. 

 





[8]The
balancing test of Rule 412(b)(3) provides that a victim’s “past sexual behavior”
is not admissible unless “its probative value outweighs the danger of unfair
prejudice.”  The language of this test
differs from Rule 403, which provides relevant evidence may be excluded “if its
probative value is substantially outweighed by the danger of unfair prejudice .
. . .”

 





[9]Tex. R. Evid. 412(b)(2)(E). 








athcock claims that the court erred in this ruling because the
information was relevant to his claims of safer alternative design. 

            Chapter 82
of the Texas Civil Practice and Remedies Code addresses products liability, and
places the burden of establishing design defect through a safer alternative
design on the plaintiff by a preponderance of the evidence.  Tex.
Civ. Prac. & Rem. Code Ann. § 82.005(a) (Vernon 2005).  The Code explains:

“[S]afer
alternative design” means a product design other than the one actually used
that in reasonable probability:  (1)
would have prevented or significantly reduced the risk of the claimant’s
personal injury, property damage, or death without substantially impairing the
product’s utility; and (2) was economically and technologically feasible at the time the product left the control of
the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

 

Tex.
Civ. Prac. & Rem. Code Ann. § 82.005(b) (Vernon 2005) (emphasis
added).  Rule 401 of the Texas Rules of
Evidence defines relevant evidence as “evidence having any tendency to make the
existence of any fact that is of consequence to the determination of the action
more probable or less probable than it would be without the evidence.”  Tex.
R. Evid. 401.  Rule 402 provides
that evidence which is not relevant is inadmissible.  Tex.
R. Evid. 402.

            While the
addition of a nylon cap ply may have prevented injury, Hathcock did not
demonstrate why evidence of the way tires are manufactured twelve years after
the tire’s manufacture would be relevant to the feasibility of adding nylon cap
plies in 1997.[5]  Therefore, we conclude that the trial court
acted within its discretion in disallowing the proffered evidence.[6]

            At the time
the tire was manufactured, it was required to meet Federal Motor Vehicle Safety
Standard (FMVSS) 119, which included a high-speed test, endurance test, “bead
push off test for dislodging the tire from the rim and a plunger test where you
plunger through the carcass of the tire and the carcass has to have a certain
resistance to that plunger.”  Some years
later, FMVSS 119[7]was replaced by
a more stringent standard, FMVSS 139.[8]  

            Nevertheless,
Hathcock complains that the trial court erred in excluding evidence of Hankook’s
latter addition of nylon cap plies to the Z36 model tire.  The date of the addition was also not
established in the record, with one expert stating in a 2009 deposition that
the nylon cap ply was added “fairly recently,” and another claiming “[Hankook]
started to apply some of the nylon applications over the past five or six
years.”[9]
 Both parties treated the addition of the
nylon cap ply as a subsequent remedial measure. 
Specifically, Hathcock alleged that a nylon cap ply was added to the
tire in order to meet FMVSS 139 and argued that the jury be presented with this
evidence at a hearing on Hankook’s motion in limine to establish feasibility of
a safer alternative design.  We examine
these claims as raised.

            Rule 407(a)
of the Texas Rules of Evidence reads:

 

            (a) Subsequent Remedial Measures.  When, after an injury or harm allegedly caused
by an event, measures are taken that, if taken previously, would have made the
injury or harm less likely to occur, evidence of the subsequent remedial
measures is not admissible to prove negligence, culpable conduct, a defect in a
product, a defect in a product’s design, or a need for a warning or
instruction. This rule does not require the exclusion of evidence of subsequent
remedial measures when offered for another purpose, such as proving ownership,
control, or feasibility of precautionary measures, if controverted, or
impeachment.

 

            To support
the contention that “the feasibility exception to Rule 407 applied” to allow
evidence of the latter addition of nylon cap plies, Hathcock cites to several
federal cases that either do not apply or contain fact patterns where a
subsequent remedial measure was employed by manufacturers shortly after the
plaintiffs’ accidents.[10]  When it comes to defective design, the
feasibility of a precautionary measure contains a temporal element.  Here, FMVSS 139 did not become effective
until well after the plaintiff’s accident, and there is no evidence in the
record establishing the date the nylon cap ply was added.  The trial court was free to conclude the
feasibility exception did not apply since there was no testimony or other
evidence demonstrating that the addition of the nylon cap ply, at some point
after the accident, could establish the feasibility of a safer alternative
design in 1997.

            Moreover,
feasibility of precautionary measures is an exception to the subsequent
remedial measure rule only if controverted. 
Here, Hankook did not controvert the feasibility of adding a nylon cap
ply.  Labuda testified that nylon cap
plies were used in the 1980s, that adding a nylon cap ply was feasible, and
that it would cost between thirty to fifty cents per tire.  The position Hankook took was that the
addition would have made no difference in the non speed-rated tire.  Because feasibility was not controverted,
Hathcock was not entitled to use this exception to the subsequent remedial
measure rule.[11]

            Alternatively,
Hathcock contends the evidence should be admitted under a different
analysis.  Because FMVSS 139 was a
government test that involved speeds of 100 miles per hour, Hathcock argued he
should be allowed to present the addition of the nylon cap ply, along with
FMVSS 139, to rebut the theory espoused by Hankook’s experts that the nylon cap
plies were needed only in “high-speed” tires. 
The trial court granted Hankook’s motion in limine “until [Hathcock had]
something to impeach.”  Labuda testified
that Hankook’s internal testing went above and beyond FMVSS 139 with increased
loads and speeds of up to 110 miles per hour, removing possibility of
impeachment.[12]  Yet, Labuda testified during cross-examination:
 “Q.  Are you aware of any
tests that Hankook has done regarding nylon cap plies on that tire?  A.  On that tire?  No, sir, I’m not.”  Hathcock also claims that he should have been
allowed to impeach this testimony. 
However, after asking this question, Hathcock neither attempted to
impeach Labuda, nor raised the issue with the trial court.[13]

            Because (1)
Hathcock did not demonstrate how Hankook’s addition of the nylon cap ply after
the accident demonstrated feasibility of adding a ply in 1997; (2) Hankook did
not controvert feasibility; and (3) Hathcock did not demonstrate necessity of
the evidence of the subsequent remedial measure for impeachment purposes, we
conclude that the trial court acted within its discretionary authority by
sustaining Hankook’s Rule 407 objection.

(3)        The Trial Court Was Within Its
Discretion in Excluding Evidence Regarding FMVSS 139

 

            The trial
court granted Hankook’s motion in limine regarding FMVSS 139, despite arguments
that it would be used to demonstrate the inadequacy of FMVSS 119 and to impeach
testimony stating the nylon cap ply was needed only in high-speed rated
tires.  During the trial, a hearing
regarding FMVSS 139 was held at the bench in which counsel clarified that he
wanted to introduce only the commentary to FMVSS 139, which stated that the
FMVSS 119 standard was inadequate. 
Counsel stated, “I think I could ask the witness questions and he could
reference the document and perhaps even quote from it without introducing it
into evidence and without talking about the new standard.”  This intention of not introducing FMVSS 139
was restated later in the trial when counsel declared, “Your Honor, I am happy
to never mention FMVSS 139.”  “I can talk
about internal Hankook tests and never mention FMVSS 139, and I’m happy to do
that because I’m not trying to get the regulation into evidence.”  The court ruled, “[W]e’re not going to get
into, ‘there’s a new standard.’  However,
I will allow evidence . . . to show that the 119 was inadequate.”  FMVSS 139 was not offered for admission into
evidence.  Instead, Cottles testified
that NHTSA concluded FMVSS 119 was “ineffective to evaluate steel belted radial
tires.”  

            Although he
did not seek to introduce FMVSS 139 during trial, Hathcock argues on appeal
that the court “erred in excluding evidence relating to FMVSS 139.”  If his present complaint concerns admission
of the actual rule, it has not been preserved for our review.  See
Tex. R. App.
P. 33.1.  Moreover, “[e]xistence
of current legislation is not relevant for any purpose in considering the duty
of a manufacturer to comply with the duty before its enactment.”  Robins
v. Kroger Co., 982 S.W.2d 156, 159 n.2 (Tex. App.—Houston [1st Dist.] 1998,
pet. denied) (citing Brown Forman Corp.
v. Brune, 893 S.W.2d 640, 644–45 (Tex. App.—Corpus Christi 1994, writ
denied)).  We see no reason that
precedent should not also apply to rules or regulations.

            It is
apparent from the briefing that the goal of introducing FMVSS 139 was to
impeach testimony that nylon cap plies are not necessary in low-speed rated
tires by demonstrating that the ply was added to Hankook’s tire in response to
tests in FMVSS 139, which went up to only ninety-nine miles per hour.[14]  Hankook objected to introduction of FMVSS 139
for this purpose based on Rule 403 of the Texas Rules of Evidence, arguing “once
the jury hears that there is . . . a subsequent standard, then no matter what
we say to try to clear that up, your Honor, the jury is going to be thinking,
Well, they should have complied with that later standard.”  Because Hankook’s experts repeatedly
testified that the nylon cap ply was added to satisfy Hankook’s own internal
testing conducted at speeds above that required by FMVSS 139, the trial court
could have found there was little probative value for impeachment
purposes.  When weighed with the threat
of interjecting a subsequent remedial measure into the trial, the court could
have concluded the probative value of the evidence was substantially outweighed
by the danger of unfair prejudice and/or confusion of the issues.  Tex. R.
Evid. 403.  We find the trial
court acted within its discretion in excluding FMVSS 139.

(4)        The Trial Court Was Within Its Discretion
in Excluding Evidence Regarding Firestone Tires

 

            Hathcock next complains that the
trial court erred in refusing to allow expert Cottles to testify that the
scalloping occurring on the belt edge of the tire was a defect also found in
recalled Firestone tires.  The trial court
had previously granted Hankook’s motion in limine with respect to mention of
Firestone tires.  The court required all
experts to state that they “had actual dealings as an expert or evaluation of
other tires” before any reference to Firestone tires “could come in.”  Because Cottles did not testify that he had
dealings as a Firestone tire expert, the trial court, in its discretion, could
sustain Hankook’s objection of failure to lay a proper predicate on the basis
that Cottles did not “establish the proper foundation,” a question of relevancy
and admissibility.  See Melton v. Collin County Cent. Appraisal Dist., No.
05-03-01737-CV, 2004 WL 3017270, at *2 (Tex. App.—Dallas Dec. 16, 2004, no
pet.) (mem. op.).

            In any
event, Hathcock is unable to establish harm. 
The following exchanges in front of the jury demonstrate that Cottles
testified about scalloping in relation to Firestone tires:

Q.        Are you—have you seen scalloping like
this on any other tire? 

 

A.        Yes,
I have.  The Firestone Wilderness AT
tires from the Ford Firestone recall had this same issue . . .

 

Q.        
So this is the same thing that the Firestone tires had?

 

            MR.
EZZELL:  Your Honor, I’m going to object
to the relevance.  I don’t think he’s
established the proper foundation.

 

            THE
COURT:  Sustained as to Firestone. 

 

In the excerpt quoted above, Hankook’s counsel’s objection
came too late to address the first above-quoted answer.  Although the trial court sustained the
objection, there was no request to instruct the jury to disregard the answer to
the first question.  Thus, Hathcock was
able to get before the jury the very evidence it alleges the trial court
excluded.  Firestone was mentioned again
the following day of trial when Cottles stated:

Why
I brought it up was that in the Firestone recall, NHTSA recognized that the
belt edges were being pinched due to the pocket design of the pattern so that
the rubber wedge was being forced out between the belts, which was leading to
belt edge separation failures and tread separations.  So that was the reason that I brought up
that.

 

Because Cottles did not establish his qualifications to
testify about Firestone tires as required by the trial court, the court was
within its discretion to disallow such testimony.  Because information regarding Firestone tires
was nevertheless presented to the jury, no harm can be shown.  We overrule this point of error.

(5)        The
Trial Court Was Within Its Discretion in Admitting Testimony from Hankook’s
Timely Designated Witnesses

 

            Hathcock
complains that the trial court erred by admitting “testimony from tire expert
Charles Patrick and from local store owner Jeff Willingham when neither witness
was timely or properly identified as a fact witness.”  Hankook’s trial witness list was filed May 1,
2009, the day designations were due.[15]  It designated “Charles Patrick [a]s Defendant’s
non retained expert.”  Hankook identified
Patrick as “a former tire engineer with Michelin Group, . . . familiar with
Hankook’s development, design, manufacture, and marketing of its tires.”  It further designated Willingham as a fact
witness, and “Owner of Discount Wheel & Tire in Greenville, Texas, who will
testify regarding his education, training, and experience in the Tire Industry .
. . [and] . . . knowledge of Hankook tires.” 
The names, addresses, and telephone numbers of these witnesses were
provided.  We find they were timely
designated as witnesses in general.  

            The trial
court’s scheduling orders stated, “Defendant Hankook Tire America Corporation
must provide to opposing counsel . . . on or before November 3, 2008 the
following:  (1) the name, address and
phone number of their testifying expert(s), (2) a report from each ‘retained’
testifying expert outlining such expert’s opinions, and (3) a curriculum vitae
from each ‘retained’ expert.”  Patrick
was proffered as a “non retained expert.” 
This expert designation did not occur in a manner consistent with the
scheduling order.  Accordingly, the trial
court ruled, “I will allow him to testify as a fact witness but not as an
expert, and he will not be allowed to give any opinions since he was not timely
designated as an expert.”  

            Hathcock
argues that despite the court’s ruling, Patrick rendered expert “opinions
regarding the quality of Hankook tires, manufacturing processes, quality
control procedure and employees.”  To
support this statement, Hathcock cites to volume 13 of the reporter’s record,
pages “89–[9]4.”  The record demonstrates
that the court sustained all objections by Hathcock raised on the basis that
Patrick was giving expert testimony.[16]  No error has been shown.

            Hathcock
also complains that “nearly all of the testimony given by Willingham consisted
of expert testimony,” citing volume 16, pages 14–29 of the reporter’s record.  The record demonstrates there were two
overruled objections to Willingham’s testimony on this basis.  The first to the question of whether “Hankook
ever told you they weren’t going to honor any warranty.”  The second was to the question “looking at
these two tires, from your own personal observation, would you put them on your
car?”  As a general rule:

observations which do not require significant
expertise to interpret and which are not based on a scientific theory can be
admitted as lay opinions if the requirements of Rule 701 are met.  This is true even when the witness has experience
or training.  Additionally, even events
not normally encountered by most people in everyday life do not necessarily
require the testimony of an expert.  The
personal experience and knowledge of a lay witness may establish that he or she
is capable, without qualification as an expert, of expressing an opinion on a
subject outside the realm of common knowledge.  United
States v. James Earl Paiva, 892 F.2d 148, 157 (1st Cir. 1989).  It is only when the fact-finder may not fully
understand the evidence or be able to determine the fact in issue without the
assistance of someone with specialized knowledge that a witness must be
qualified as an expert.

 

Osbourn v. State,
92 S.W.3d 531, 537 (Tex. Crim. App. 2002); see
also Davis v. State, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010).  Willingham’s
answer to the first question was simply based on his observation of what he had
heard from Hankook, and the trial court could have decided any lay person could
have answered the second question based on perceptions of sight and touch
without the benefit of any specialized knowledge.  We cannot say that the trial court acted
without reference to guiding rules and principles when allowing Willingham to
testify based on personal experience.

            We find the
trial court did not abuse its discretion in allowing Patrick and Willingham to
testify.  This point of error is
overruled.

(6)        No Error Appears Regarding Evidence from
the Publication “The Pneumatic Tire”

            During cross-examination
of Cottles, Hankook referenced “The Pneumatic Tire,”[17]
which Cottles testified was a NHTSA sponsored publication.  Direct examination of Grant produced the
following exchange:

Q.        And is that publication, The Pneumatic Tire, is that a
publication that is approved and sponsored by NHTSA?

 

A.        Yes.[18]

 

Q.        And
does it appear to be—that is, NHTSA’s position—that localized road hazard
impacts does, in fact, lead to failure of tires sometime later or can lead to
failure of a tire sometime later?

 

            MR.
PEARSON:        Your Honor, I object to
the question as calling for speculation as to what NHTSA’s position is on any
issue.  That’s not what the book
says.  These are simply a compendium of
articles.  

 

            THE
COURT:             I’ll sustain.

 

Q.        [By.
Mr. Ezzell] Okay.  Based on this
publication, Mr. Grant, does NHTSA, in fact, support the position that road
hazard impact leads to intracarcass pressurization?

 

            MR.
PEARSON:        Your Honor, I object to
calls for speculation.  He can testify
about what’s in the book, but he can’t testify as to what NHTSA believes or
what their opinion is or what they support. 

 

            MR.
EZZELL:                        Your Honor
--

 

            THE
COURT:             Well --

 

            MR.
EZZELL:                        -- it’s a NHTSA sponsored publication, Your Honor.  It’s an --

 

            THE
COURT:             Overruled.  

 

            Even
assuming error, Hathcock is unable to demonstrate harm.  After overruling the objection, the court
said, “Let me interrupt you, Mr. Ezzell, since we’re interrupted anyway,” and
an immediate lunch break was held.  Grant
never answered this question.  Instead,
the question was asked in a different form. 
After the break, Grant testified that the “publication also support[ed]
[his] opinion . . . that road hazard impact leads to intracarcass
pressurization and can result in tire failure sometime after the initial road
hazard impact.”  The issue of speculating
about NHTSA’s opinion was removed. 
Therefore, Hathcock’s last point of error is overruled.

            We affirm the trial court’s judgment.

 

 

            

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

CONCURRING OPINION

 

            One of the
disputes was whether nylon cap plies placed on tires made them safer.  Some of the testimony was that they were only
helpful on tires designed for extremely high speeds.  In an 
attempt to show the nylon cap ply was also safer on non speed-tires,
Hathcock proffered evidence that Hankook later added nylon cap plies to the Z36
model tire.  The majority opinion states
that both parties treated the addition as a subsequent remedial measure and
then analyzes the evidence on that basis. 
The problem is that there was no evidence that the addition was a
subsequent remedial measure.  Rule 407(a)
of the Texas Rules of Evidence, entitled Subsequent Remedial Measures, states, “[w]hen
after an injury or harm allegedly caused by an event, measures are taken that,
if taken previously, would have made the injury or harm less likely to occur,
evidence of the subsequent remedial measures is not admissible . . .”  Here, there is no evidence of any injury or
harm caused by an event that prompted the addition of the nylon cap plies.  I believe the majority opinion relies on an
inapplicable rule to approve the exclusion of the evidence.  

             Further, the technology for the nylon cap ply
was in existence at the time the tire in question was manufactured.  The plaintiffs were required to prove that a
safer alternative design was available that was economically and
technologically feasible at the time the product was manufactured by
application of existing or reasonably achievable scientific knowledge.  There is no dispute that the technology was
available when the tire was manufactured, and it was later added at a small
cost per tire.   

            No reason
has been shown to preclude the relevant evidence that Hankook added the very
feature the plaintiffs argued would make a safer alternative design.  Exclusion of the evidence was error.   

 

 

 

 

 

            To reverse a
judgment based on error in the admission or exclusion of evidence, it must be
shown that the error probably caused the rendition of an improper
judgment.  Tex R. App. P.
44.1(a)(1).  After a review of the entire
record and all evidence admitted, I would not find the error was of that
magnitude; I concur in the judgment as announced in the majority opinion.  

 

 

 

                                                                                    Jack
Carter

                                                                                    Justice


 

Date Submitted:          October
6, 2010

Date Decided:             December
17, 2010

 











[1]The
anatomy of the tire consists roughly of an inner liner, beads, polyester radial
body plies, skim stock rubber sheet, steel belt #1, belt wedge, skim stock
rubber sheet, steel belt #2, and tire tread.  






[2]The
tires were meant to operate at a pressure of fifty psi.  According to Labuda, they operated
chronically at thirty-five psi or below. 






[3]Grant
also stated continued operation of a tire that’s substantially underinflated or
flat will result in wrinkles or marbling not found in the subject tire. 





[4]Grant
also testified nylon cap plies can be used in “even lower speed rated tires if
there’s a need to use nylon in order to get the speed capability that you’re
looking for.” 





[5]Hathcock
cites Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328 (Tex. 1998). 
In that case, the court found admissible testimony that competitors were
already using the safer alternative design and the fact that the company
switched to the safer alternative design one year after the accident as
evidence of its feasibility.  Id. at 337.  In this case, Grant testified that the Chevy
Tahoe tires did not have a nylon cap ply. 
Hankook was the only other manufacturer mentioned during this exchange
as a company who had included nylon cap plies years after the tire’s
manufacture in response to new government regulations. Uniroyal is distinguished from this case because Cottles could not
name a manufacturer who was using nylon cap plies in load range C tires around
1997, and Hankook’s switch to nylon cap plies years after the tire’s
manufacture could not establish evidence of feasibility in 1997.

 





[6]Hathcock
cites cases which held information that other manufacturers were using a safer
alternative design was relevant, even if occurring shortly after the allegedly
defective product’s manufacture.  Here,
there is no offer of proof in the record suggesting that any other manufacturer
was using nylon cap plies in light truck, load range C tires close to the 1997
time frame.  

 





[7]FMVSS
119 was created at a time where most tires on the market were bias ply, as
opposed to radial ply tires. 

 





[8]The
record is unclear regarding the effective date of FMVSS 139.  At one point, the record stated “in 2001 or
2002, 119 was changed to become 139,” and at another point, it was averred that
the new standard “didn’t come into being until 2006 or 2007.”  Deposition testimony implied that “[i]t was
certainly in 2001 or 2002, was the first indication of a proposal for a new
standard.  There was a series of proposed
rule makings issued by NHTSA, and that process took place between 2002 and, I
believe, roughly 2005 with the final implementation ruling being . . . around
Septemberish 2007.”  It would seem that
FMVSS 139 was proposed in 2002 and established as a final rule by the NHTSA in
November of that year, to be effective September 1, 2003.  67 Fed. Reg. 69,600-01 (Nov. 18, 2002).  Based on petitions for reconsideration of the
rule, however, the effective date of FMVSS 139 was postponed first to September 1,
2004, and then to September 1, 2005.  68
Fed. Reg. 33,655-01 (June 5, 2003); 69 Fed. Reg. 31,306-01 (June 3, 2004).  The standard was first codified in 2005, and
modified several times thereafter to push the final effective date to September
1, 2007.  49 C.F.R. § 571.139 (2008); 71
Fed. Reg. 877-02 (Jan. 6, 2006); 67 Fed. Reg. 69,600 (Nov. 18, 2002).  The accident in this case occurred in 2004,
several years before FMVSS 139 became effective.

 





[9]Arguments
of counsel stated the “nylon was added in 2007.”  





[10]See Flock
v. Scripto-Tokai Corp., 319 F.3d 231, 240 (5th Cir. 2003) (subsequent
remedial measure was not an issue in this case; case discussing economic feasibility
for safer alternative design); Reese v.
Mercury Div. of Brunswick Corp., 793 F.2d 1416, 1428 (5th Cir. 1986) (after
jury rejected claim of defective design, evidence that manufacturer distributed
manual discussing kill switch use in same year as plaintiff’s accident was used
to demonstrate feasibility with regard to inadequate warning claim, since it
was controverted); Dixon v. Int’l
Harvester, 754 F.2d 573, 583–84
(5th Cir. 1985) (holding subsequent remedial measure rule did not bar evidence
of changes made to tractor by a
nondefendant “shortly after the accident”); Lolie v. Ohio Brass Co., 502 F.2d 741, 744–45 (7th Cir. 1974) (finding
trial court did not err in failing to allow subsequent remedial measure where
feasibility was not controverted); Green
SeaRiver Mar., Inc., No. G-05-423, 2007 WL 173233, at *1 (S.D. Tex. 2007) (order
denying motion for new trial because trial court considered subsequent remedial
measure where feasibility was controverted); Seeley v. FKI Logistex, No. 6:07-CV-381-DNH-DEP, 2009 WL 2871170,
at *3 (N.D.N.Y. Sept. 3, 2009, no pet.) (subsequent remedial measure was not an
issue; rather case held evidence of change in design less than two weeks after
accident was evidence of feasibility of safer alternative design).

 





[11]During
cross-examination Grant stated:

 

Q.  Nylon cap plies were used by the 1980’s,
correct?

 

A.  Yes. 
Yeah.  In certain tires, yes. 

 

Q.  It was certainly feasible for Hankook to have
added a nylon cap ply to this tire back in 1997, correct?

 

A.  I don’t know. 
You’d have to ask Hankook that. 
You can’t just throw a nylon cap ply into a tire.  There’s a lot of design considerations.

 

Q.  So you’re saying that you might not be able
to just add—you might not—it might not have been feasible for Hankook to add a
nylon cap ply to this tire?

 

A.  Yeah. 
I think that’s a question you’d have to ask Hankook, when it was
feasible to do it in a certain tire.

 

From this testimony, it appears Grant did
not contest the economic and technological feasibility, but rather, whether the
addition would make for good design.

 





[12]Hathcock
cites to testimony by Labuda that nylon reinforcement was used to improve
performance of the tire on the indoor wheel machine to comply with “specific
indoor high-speed test protocols” such as FMVSS 139.  This testimony is consistent with Hankook’s
position that nylon cap plies were not needed in non speed-rated tires.  Labuda further explained that, contrary to
Cottles’ testimony, “what holds a tire together, we all know, is the rubber and
the curing process and the components. 
So the nylon is not holding the tire together.”  “Under high speed, centrifugal force does
cause the tire to want to expand and the nylon assisted in that.  But under normal operations—and we’re talking
in excess of over hundreds of miles an hour—but in normal operations, that
nylon is just passive, noncontributing component to the performance of a
tire.”  

 





[13]Perhaps
that is because Labuda could have understood “that tire” to mean the 1997
detreaded tire, which did not undergo nylon cap testing, as opposed to later
models of the Z36.





[14]This
argument assumes that ninety-nine miles per hour is “low speed” for testing
purposes.  





[15]An
amended scheduling order entered after the witness list was produced extended
the deadline to designate trial witnesses to August 7, 2009.  





[16]Hathcock
also argues that Patrick’s and Willingham’s opinions were generally
irrelevant.  The trial court overruled
relevance objections to Patrick’s work history, the fact that he had visited
the Daejeon plant, and the fact that Michelin still approves and has Hankook
manufacture Michelin tires, including Z36-type tires.  Although the court did not give its reasons
for overruling the objections at the time, similar objections to Willingham’s
testimony produced the rationale that Hankook’s reputation was in issue.  For the first time on appeal, Hathcock
contends admission of Patrick’s and Willingham’s testimony was more prejudicial
than probative.  There was no Rule 403
objection to the testimony during the time of trial.  Accordingly, we decline to address this
argument. 





[17]The
publication was not introduced into evidence. 


 





[18]Hathcock
complains that he was unable to object to the representation that “The
Pneumatic Tire” was approved by the NHTSA because the version produced by
Hankook omitted a disclaimer later added in a 2006 reprint that “The opinions,
findings and conclusions expressed in this publication are those of the
author(s) and not necessarily those of the Department of Transportation or the
National Highway Safety Administration.” 
This complaint was first raised to the trial court in a supplemental
motion for new trial, which Hankook argues was untimely pursuant to Tex. R. App. P. 21.4(b).  The judgment was signed October 7, 2009, and
the supplemental motion was filed December 1, 2009.  A trial court has discretion to consider an
untimely supplemental motion for new trial while the court retains plenary
power.  Lopez v. Ford Motor Co., No. 04-08-00091-CV, 2009 WL 636517, at *2
(Tex. App.—San Antonio March 11, 2009, no pet.) (mem. op.).  “[B]ut if the trial court denies a new trial,
the belated motion is a nullity and supplies no basis for consideration upon
appeal of grounds which were required to be set forth in a timely motion.”  Mortiz
v. Preiss, 121 S.W.3d 715, 720 (Tex. 2003).  We find that “the untimely motion did not
preserve any issue for appellate review.” Id.;
Lopez, 2009 WL 636517, at *2.